## Case No. 12,778.

### SHERWOOD v. McINTOSH.

[1 Ware (109) 104.] [1]

District Court, D. Maine. Dec. Term, 1826.

SEAMEN—RIGHT OF MASTER TO DISRATE — INTEMPERANCE — DESERTION — WHEN JUSTIFIED—WAGES.

1. When a seaman ships for a particular service and is found to be not qualified for that duty, the master is authorized to put him to a different service, and may make a reasonable deduction from his wages. But he is not authorized to put him on a different duty without a reasonable cause.

[Cited in Allen v. Hallet, Case No. 223.]

2. Dishonesty or habits of intemperance are sufficient causes for degrading a steward and putting him before the mast. But a single instance of intemperance is not.

3. Cruel and oppressive treatment on the part of the master will justify a seaman in deserting the vessel before the termination of the voyage.

[Cited in Bush v. The Alonzo, Case No. 2,-223; The Alvena, 22 Fed. 862.]

4. When a seaman is compelled to desert by the cruelty of the master, he does not forfeit his wages, but will be entitled to receive them in full to the prosperous termination of the voyage.

[Cited in Gabrielson v. Waydell, 135 N. Y. 19, 31 N. E. 969.]

This was a libel for seaman's wages. The libel set forth a contract on the part of the libellant, to serve as steward on board the ship Elizabeth, on a voyage from Portland to New Orleans and from thence to Europe and back to the United States, at the rate of wages of eighteen dollars per month. It

alleged that he faithfully performed his duty as steward until the arrival of the ship at New Orleans, where he was degraded by the master from the office of steward, and put before the mast; that he continued on board the vessel and did duty as a seaman until the arrival of the vessel at Havre; that then, in consequence of the continued ill-treatment that he experienced, he was afraid to remain longer in the ship, and left her. The several instances of assaults and ill-treatment are minutely and particularly set forth in the libel, and relied upon as a justification for abandoning the vessel, and full wages are claimed to the termination of the voyage.

The respondent admits the contract as alleged in the libel, and admits that he degraded the libellant from the office of steward and put him before the mast, and justifies the act by the allegation that on the outward voyage to New Orleans he was found to be unfaithful and an habitual drunkard; he denies, in toto, the charges of ill-treatment and cruelty, and alleges a desertion of the libellant as a bar to any claim of wages.

C. S. Daveis, for libellant.

Mr. Greenleaf, for respondent.

WARE, District Judge. This case has been very elaborately and very ably argued upon the facts and the law, and now stands for decision upon the allegations of the parties and the proofs produced in the case. The respondent admits the contract as set forth in the libel, and the libellant admits on his part the desertion as it is alleged in the answer. It is a familiar and well-known principle of the marine law that desertion operates a forfeiture of all wages antecedently earned. By admitting the desertion, the libellant takes upon himself the necessity of withdrawing his case from the operation of the general rule, that is, of justifying the desertion.

For the libellant, it is contended that the desertion was justified, first, by his degradation from the office of steward, and his being required to perform duties which he did not contract to perform; and secondly, that it was justified by the cruel and oppressive conduct of the master to him. The simple fact that the libellant was degraded and put before the mast is not, in itself, a justification of desertion. When a mariner contracts for a particular service or duty on board a vessel, he engages both for fidelity in the performance of that duty, and for that capacity and those qualities which will enable him to perform the service in a satisfactory manner. If the master finds, upon trial, that there is on the part of the man either a want of fidelity or a want of capacity which disqualifies him for the service, he will be justified in putting him upon a different duty. And in such a case the master will also be justified, not in refusing altogether to pay him wages, but in making from them

a reasonable deduction. Atkyns v. Burroughs [Case No. 618]; Mitchell v. The Orozimbo [Id. 9,667]. But when the man has contracted for a particular service, the master is not authorized to change the terms of the contract capriciously and without a good cause, and require of him duties for which he did not engage. The master, in this case, alleges as a justification of his act. first, the want of fidelity and the dishonesty of the libellant; and secondly, a constant habit of intemperance. These are grave charges, and either of them, if proved, would be a justification.

The only testimony applying to the first allegation is that of Proctor, the first mate. He states that a barrel of rum was put on board the vessel, for the sailors' use, at Portland, and that on their arrival at New Orleans it was found to be almost entirely gone, and that the consumption very greatly exceeded the allowance to the men. As it was in the custody of the steward, the inference is that it must have been wasted by him. As this fact rests on the testimony of the mate alone, and as this witness is principally relied upon to prove the other allegation, of habitual intemperance, it becomes important to determine what degree of credit is to be given to his testimony. It is contended by the counsel for the libellant that he is utterly discredited, and that his testimony must be entirely laid out of the case. The whole credit which we give to parol testimony is founded on two presumptions; first, the intelligence and good sense of the witness, which will prevent him from being deceived himself; and secondly, upon his good faith and integrity, which will prevent his intentionally deceiving others. If, then, it is proved beyond any reasonable doubt, that a witness is guilty of prevarication, either in deliberately stating what is not true, or in wilfully suppressing material and important facts which are within his knowledge, one condition upon which we yield our belief to human testimony fails. If the witness deals falsely with the truth in one case, no assurance can be felt that he will not in another, and of course no confidence can be placed in any part of his testimony, and hence the maxim falsus in uno, falsus in omnibus.

It is proved beyond the reach of doubt that the libellant received a severe injury at New Orleans, a short time before his first imprisonment, nor does there appear to be much if any more doubt that this was inflicted by the hand of the master, in the cabin. If so, the mate, who, according to his own statement, was in his state-room, abed but not asleep, must have known the circumstances, and he was the only witness who could have known them. Sherwood, according to the account of this witness, came into the cabin about half past nine o'clock, on his way to the steerage to turn in for the night. There was a light in the cabin and a window

in the door of his state-room, looking into the cabin, so that he could see what took place. The captain, he says, charged Sherwood with breaking a lock; Sherwood denied it, and the charge and the denial, as the witness states, were several times repeated, when the captain told him if he did not go to bed he would flog him. Sherwood replied that he might as soon as he would. He thought from Sherwood's voice that he was intoxicated. He heard, as he says, no noise except a little rumbling like the moving of a chair. The rest of the crew were in the forecastle, and the whole space between that and the cabin was filled with hay, so that a noise in the cabin could not be heard by the men. The next morning Sherwood was seen by Harmon, a witness introduced by the captain, "with his face bloody, his upper lip cut, holding his handkerchief, which was covered with blood, to his face; his under lip also appeared to be cut and swollen, and the lower part of his face, from below his eyes to his chin, was bruised." Afterwards, either that day or the next, the same witness says that he saw him "in his berth, with his handkerchief to his mouth, and he could but just speak so as to be understood." Jordan, another witness examined for the captain, saw him also, bloody, and with his lips cut and swollen. This comes from witnesses whom the master himself has called in the defence. The witnesses for the libellant give a more highly colored picture of that night's disaster. On the same morning when those marks of brutal violence were observed, Sherwood asked this witness, the mate, to look into his mouth, and see the wound which he had received. He declined, but what is remarkable, when his attention was particularly called to the subject, he could see no marks or bruises on his face. Now unless all the other witnesses in the case are guilty of flagrant perjury, the libellant appears with his lips cut and swollen, his face covered with gore and bruised from the eyes to the chin, and, as one of the libellant's witnesses says, with fresh blood still oozing from the unclosed wounds of his mouth, and yet, when the attention of this witness was called directly to the subject, he could see nothing—no blood, no wounds, no swelling, no marks of violence whatever. How is it possible to resist the conviction that this is a case in which the words of the old proverb are verified, that none are so blind as those who will not see? But the credit of this witness is not left here. A witness for the libellant was called, of unimpeachable character, who says that after the mate returned from New Orleans, he was employed at work on a vessel of which this witness was first officer; that having heard the rumor of this affair, and being acquainted with Sherwood's family, he inquired of him about it, and that he told him that, upon the night in question, while he was abed in his state-room, he heard a noise in the cabin as though one man was strang-

ling another; that he got up and opened the door, and asked what was going on. The captain answered as though it was a trifle, and the witness then replied, "There must be no murder here." The mate now utterly denies this conversation, and the witness, when called again, directly reaffirms it. I cannot hesitate which to believe. Taking the whole testimony together, bearing on this part of the case,—and it is proved by that clearness and force of evidence to which the mind cannot withhold its assent, that there was perpetrated in the cabin on the night in question, a deed of dark and barbarous cruelty, the circumstances of which were known to this witness, and which he has refused to discover,—he has shown himself capable of prevarication to such an extent as destroys all the confidence which otherwise might be felt in his testimony.

There being no evidence in support of the charge of unfaithfulness but the testimony of Proctor, I dismiss it as not sustained by proof. The other cause alleged by the master for degrading the steward, is habitual intemperance. Now the only evidence of a habit of intemperance we have, is found in the testimony of Proctor. That, for the reasons already stated, I lay out of the case. Harmon, the apprentice of the master, says that Sherwood was intoxicated the morning of sailing from Portland, but that he never saw him intoxicated at any other time on the passage to New Orleans. Jordan, another witness, says that he saw him frequently intoxicated on the passage from New Orleans to Havre; that he would drink all he could get, and often more than his allowance when he could get it of the other men, but that he never saw him drunk on the passage to New Orleans. The habits of intemperance of which Jordan speaks, were after the master had degraded him from the office of steward, and after the cruelties which were practised upon him while the vessel was lying at New Orleans. This subsequent misconduct of Sherwood, which from the whole evidence it seems reasonable to attribute to the harshness and severity with which he was treated by the captain, can be no apology for the captain's removing him from the place of steward, and requiring of him duties which he had not engaged to perform. The whole proof in support of this allegation of the answer is resolved into a single instance of intoxication. I am not disposed to look upon intemperance as a slight offence. It disqualifies a man, for the time, from discharging the obligations of his contract, whatever may be his duty on board the vessel. It is an offence particularly noxious in a steward, who is intrusted with the ship's stores; and if a habit of intemperance had been proved I should feel no difficulty in holding it a justification of the master in degrading him from office, or perhaps in discharging him from the vessel altogether. Black v. The Louisiana [Case No. 1,461]. But in the admin-

istration of the maritime law, especially in controversies which arise between the master and mariner, regard must be had to the ordinary habits of this class of men; habits which very naturally grow out of the nature of their employment. It is, unfortunately, too common for them to indulge in enjoyments of this kind, and it would be applying to them too rigorous a rule, to hold that a single instance of excess was a disqualification. The Exeter, 2 C. Rob. Adm. 264. The master has therefore entirely failed in proving a justification of the act of degrading the libellant, and the requiring of him the performance of duties for which he did not engage. It is contended that this was, of itself, a dissolution of the contract on the part of the master, and absolved the libellant from all obligation of remaining longer in the vessel. But it is unnecessary to inquire what were the rights of the parties at this stage of the business, because the libellant actually continued in the vessel and performed the voyage to Havre.

I pass, then, to the second ground alleged by the libellant as a justification of his desertion, the oppressive and cruel treatment of the master. The libellant relies upon the general and habitual ill-usage from the master, as well as on the particular instances of cruel and undeserved punishment set forth in the libel. The first instance is that which has already been mentioned. The only person who witnessed this, as we have seen, was the first mate. If it be admitted that all the provocation existed that he has stated, it cannot be for a moment pretended that it can justify such a barbarous outrage as was committed by the master. The second instance of ill-usage, relied upon in the libel, is the imprisonment at New Orleans. The next day after the affair in the cabin, Sherwood went on shore to obtain medical aid. For this he was noted in the log-book as absent four hours without leave. The two following days he is noted as absent the whole time, without leave, and is recorded in the log as a deserter. During this time he had entered a complaint against the master for an assault and battery, the master had been before the magistrate, and there had been a hearing upon the complaint. It cannot for a moment be pretended that this was a desertion, in the sense of the marine law. To constitute a desertion, within the meaning of the general maritime law, something more is required than a single absence without leave. There must be an absenting of the seaman furtively with the intention of keeping himself out of the reach of the master, and of abandoning the vessel altogether. A single absence without leave, for a temporary purpose, does not, upon the general principles of the law, amount to a desertion, working an entire forfeiture of wages. The statute of the United States is indeed, in this particular, more rigorous than the general law, and considers an absence of forty-eight hours, with-

out leave, as a desertion, and applies to it the forfeiture of all wages due at the time. Act July 20, 1790, § 5 [1 Stat. 133]. But it does not touch wages subsequently earned. But was there, in this case, a desertion within the meaning of the statute? He had not absconded; he did not secrete himself, and avoid the master. He was during the whole time appealing to the laws of his country for a redress of his wrongs, and had summoned the master to meet him before a public tribunal to answer his complaint. No case has been cited in which an absence without leave, under such circumstances, has been held to be a statute desertion, nor can it be supposed that the statute intended to inflict a forfeiture upon a seaman for appealing for redress of injuries, real or supposed, to the justice of his country.

The day after Sherwood was noted as a deserter, he voluntarily came on board, and asked for his clothes. By order of the captain he was apprehended as a deserter, and sent to prison, and was held in prison under this commitment for the space of 132 days, from the 14th of December to the 24th of April. During this time, he repeatedly applied to the captain to be liberated, and offered to return to duty. But the captain was inexorable; and when he was finally discharged, after more than four months' imprisonment, it seems to be the fact, though the evidence is not distinct on this point, that he was discharged by the local authorities, and not on the application of the captain. At the argument it was not pretended that he was discharged by the captain's order. Admitting that the imprisonment was originally justifiable, which is not conceded, it becomes wrongful after these repeated applications to be discharged, and offers to return to duty. It is a well-known and familiar principle of the marine law, that if a seaman is guilty of a fault and afterwards repents and tenders amends, he shall be pardoned. Cleirac, p. 51; Jugemens D'Oleron, 12; Whitton v. The Commerce [Case No. 17,604]. But the punishment was here continued more than four months, and that while the ship was advertised for sale, as well as freight, and while it was quite uncertain whether the voyage would not be broken up at that port. It is said that the master refused to liberate him from prison, because he had reason to fear that if he did, Sherwood would desert again. But it surely cannot be urged as a reason why the master should not pardon a man upon his repentance and offer to return to duty, because he feared he would commit the same fault a second time. If so, the master may always intrench himself behind his own suspicions, and a seaman who has once committed a fault can never rehabilitate himself and regain his place in the vessel. It is equivalent to saying that a master is not bound to pardon a repentant seaman, unless he chooses to do so. The law I take not to be so, but that the master is bound to take back and restore a repentant seaman who gives reasonable evidence of the sincerity of his repentance. It is urged that the fact that he did desert again, soon after his liberation, is a proof that the master's apprehensions were well founded. After the sample he had experienced of the master's temper, I must say that it is not surprising that he was desirous of making his escape. But it by no means follows that he would have deserted if the captain had himself liberated him from confinement, and treated him with humanity. He was again retaken, and by the captain's order imprisoned a second time, from the 13th of May to the 9th of June, when he was taken on board the vessel upon the day of her sailing for Havre. Here it is said that Sherwood again forfeited his wages. He was arrested on a warrant, issued by a magistrate under the seventh section of the act of July 20, 1790. By the provisions of that section of the act, the master is authorized to charge the expenses of the commitment on the seaman, and deduct them from his wages. Can he also insist upon the entire forfeiture of his wages under the fifth section? It was held in the case of Bray v. The Atlanta [Case No. 1,819], that the penalties in these two sections are not cumulative; that the master may take his remedy under one or the other, but if he elects to imprison the seaman, under the seventh section, he waives the forfeiture under the fifth.

On the passage to Havre there was another instance of ill-usage, particularly relied upon by the libellant. While he was aloft in the night time, furling the sails, he is charged with using insolent language to the mate. The mate did not hear it, but it seems the captain did, and he was ordered down, when the mate, by the captain's order, flogged him with a rope. From twenty to thirty blows were given and the outcries of Sherwood were such as to call upon deck not only the crew who were below, but also the passengers. The next morning his back was seen by some of the crew, who testify to the marks of the blows. It is undoubtedly the duty of the master to require a respectful demeanor on the part of the men to his subordinate officers, as well as to himself. But the punishment in this case was indicative of the harsh and unrelenting temper of the master, and altogether disproportionate to the offence. Other instances of unwarrantable severity are stated in the libel, but these are the principal. There is also an allegation in the libel that the conduct of the master was habitually harsh and oppressive. The general deportment of Sherwood is differently represented by the witnesses. Those examined in behalf of the captain say that he appeared by his conduct desirous to provoke the captain to strike him, while the others say that he appeared to be in terror whenever the captain spoke to him. The same acts might undoubtedly produce different impressions upon different minds, and a carriage and demeanor that

sprung from terror, might have some of the appearance of impertinence. But that a man of the libellant's slight form and almost puny appearance, of whom light work was only required, because he was unable to perform the duties of an able seaman, should, after the experience he had of the captain's temper and muscular strength, have sought opportunities to encounter them, is to me altogether incredible. Some time after the vessel arrived at Havre, Sherwood again abandoned the vessel, succeeded in eluding the pursuit of the captain, and returned home in another vessel. He now claims his entire wages for the voyage, alleging the griefs which he has set forth in the libel as amounting to a violent dissolution of the contract on the part of the master.

That cases may exist which will justify a seaman in abandoning the ship before the termination of the voyage, cannot be doubted. There are reciprocal duties between the master and his men. The seaman engages for the faithful performance of the services for which he contracted; the master, on his part, engages to treat his men with humanity, and this obligation of the master is not the less imperative because masters do not think it necessary to insert any stipulations in the contract, which may look like restrictions on their power. If the master, instead of exercising the authority with which the law invests him, with moderation and humanity, and for sustaining a proper discipline on board the ship, gives himself up to a harsh and cruel temper, and flogs and beats a man with unreasonable severity, or if, yielding to a personal pique or prejudice, he harasses a man by capricious tyranny, and punishes him without cause, or punishes him for slight and venial faults with unreasonable and wanton cruelty, even if a seaman cannot show that his life would be endangered by remaining in the vessel, he is not bound to submit himself as an object of sport to the ungoverned passions of the master. He may abandon the vessel without subjecting himself to a forfeiture of his wages. The libellant has stated in his libel that he was in fear, and dared not trust himself in the captain's power. From the evidence in the case of the outbreakings of a violent and unchastened temper on the part of the captain, as well as for the cold and unrelenting severity manifested by the long imprisonment at New Orleans, I can readily believe the allegations to be true, and I think he was justified in seeking his own safety by abandoning the ship. My opinion is also that he is entitled to his wages, not only to the time when he left the vessel, but to the termination of the voyage. If the master dismisses a man before the end of the voyage for which he has contracted, without a justifiable cause, he may follow the vessel and recover the same wages he would have been entitled to if he had remained in the vessel until the voyage was

ended. Jugemens D'Oleron, art. 13; Laws of Wisbuy, art. 25. The reason is to the full as strong for allowing full wages, when the cruelty of the master has compelled him to leave the vessel from a regard to his personal safety. And so it has been decided both in this country and in England. Limland v. Stephens, 3 Esp. 269; Relf v. The Maria [Case No. 11,692]; Ward v. Ames, 9 Johns. 138.

I decree full wages at the stipulated price of eighteen dollars a month, to the termination of the voyage, deducting the payments which had been made in advance and during the voyage.