**UNITED STATES, Appellee,**

v.

**Specialist Four Michael G. McDONAGH, SSN 217–72–9616, United States Army, Appellant.**

**CM 439377.**

U. S. Army Court of Military Review.

27 Jan. 1981.

Captain Edward J. Walinsky, JAGC, argued the cause for the appellant. With him on the brief were Colonel Edward S. Adamkewicz, Jr., JAGC, and Major Charles A. Byler, JAGC.

Captain Kenneth H. Clevenger, JAGC, argued the cause for the appellee. With him on the brief were Lieutenant Colonel R. R. Boller, JAGC, Major Ted B. Borek, JAGC, Captain Brian X. Bush, JAGC, and Captain Michael C. Chapman, JAGC.

Before FULTON, CLAUSE and FOREMAN, Appellate Military Judges.

## OPINION OF THE COURT

FULTON, Senior Judge:

On trial before a general court-martial for wrongfully selling cocaine twice at an American military installation in Germany, and conspiring to sell and wrongfully transferring cocaine on another occasion, McDonagh contested the court's jurisdiction over him as a person subject to the Uniform Code of Military Justice. He asserted that his enlistment was void because it had been accomplished with the fraudulent assistance of a recruiter and that, as a result, he was not subject to in personam jurisdiction in view of the doctrine announced by the Court of Military Appeals in *United States v. Russo*, 1 M.J. 134 (C.M.A.1975).

During the trial, Congress amended Article 2 of the Uniform Code of Military Justice, 10 U.S.C. § 802 (1976), in a manner designed to overcome the effect of the *Russo* case. Articles 2(b)–(c), Uniform Code of Military Justice, 10 U.S.C.A. § 802(b)–(c) (1980 Supp.), as added by sec. 801(a)(2), Department of Defense [DoD] Authorization Act, 1980, Pub.L. 96–107, 93 Stat. 810. The military judge thereupon ruled that the court-martial had jurisdiction over McDonagh. McDonagh thereafter entered pleas of guilty, was convicted, and received a sentence which, as modified and approved by the convening authority, includes a dishonorable discharge, confinement at hard

labor for 30 months, forfeiture of all pay and allowances, and reduction to the grade of Private E–1.

On this review pursuant to Article 66 of the Uniform Code of Military Justice, 10 U.S.C. § 866 (1976), McDonagh again contends that the court-martial lacked in personam jurisdiction and, in addition, also asserts that his guilty pleas were improvident because a plea bargain involved his stipulating to the testimony of certain defense witnesses in extenuation and mitigation rather than requesting their return from the United States to testify in person.

■ As to the jurisdictional question,[1] my brothers and I conclude that the 1979 amendments to Article 2 apply retroactively to validate existing enlistments contracted before the amendments were enacted. I believe that, even so, they cannot constitutionally be applied so as to permit trial by court-martial for offenses committed prior to their enactment. My brothers disagree with me. Their vote to affirm the conviction will control our disposition of this case.

### I. The Question of Jurisdiction

#### A. Facts Alleged Concerning McDonagh's Enlistment

The essence of McDonagh's contention is that he was ineligible for enlistment because of being dependent upon drugs and that his recruiter assisted in concealing this disqualification.

On or about 3 January 1976, McDonagh began the process of enlisting and was on 5 January enlisted in the Army Reserve with a commitment directly to enlist in the Regular Army for a period of four years or to enter on active duty as a reservist for a like period. On 21 January 1976, he fulfilled this commitment by enlisting in the Regular Army for a four-year term.[2]

At the time, Army regulations governing both Regular Army enlistments and enlistments in the Reserve under the delayed-entry program categorized "[q]uestionable moral character, alcoholism, [and] drug dependence" as "nonwaivable moral and administrative disqualifications" for enlistment. Army Regulation 601–210, Personnel Procurement: Regular Army Enlistment Program, pars. 1–1, 2–2 (table 2–1, rule G), 3–1, and Appendix A (15 January 1975, with amendments including Change 3, 1 December 1975).

The regulation also specified that male applicants without prior service, such as McDonagh, must meet standards of medical fitness prescribed in chapter 2 of Army Regulation 40–501, which had been established by the Department of Defense for all services. This medical regulation provided in part as follows:

> The causes for rejection for appointment, enlistment, and induction are—
>
> a. *Character and behavior disorders,* as evidenced by—
>
> .    .    .    .    .
>
> (5) Drug abuse characterized by—
>
> .    .    .    .    .
>
> (c) The repeated use of any drug or chemical substance, including marijuana, with such frequency that it appears that the examinee has accepted the use of or reliance on these substances as part of his pattern of behavior. . . .
>
> (d) Cases indicating use of marijuana (not habitual use) or experimental or casual use of other drugs, except . . . [narcotic drugs], may be waived by competent authority, as established by the respective service, providing there is no history of

1. A plea of guilty does not foreclose consideration of jurisdictional questions on appeal. *Cf. United States v. Lopez,* 20 U.S.C.M.A. 76, 42 C.M.R. 268 (1970) (nonjurisdictional defect waived by plea).

2. These delayed-entry programs permit an enlistee to accrue service credit for pay and promotion by virtue of Reserve status, while fin-

ishing a school term, for example, and preserve the right to enter the Regular Army with previously selected options as to training, place of service, or the like. Under the *Russo* doctrine, invalidity in the Reserve enlistment of 5 January would also infect the related Regular Army enlistment of 21 January. *See United States v. Torres,* 7 M.J. 102, 104 (C.M.A.1979).

repeated drug uses and there is evidence of current drug abstinence . . . .[3]

Testifying in support of his motion to dismiss the charges for lack of in personam jurisdiction, McDonagh claimed that during the month prior to his enlistment he was smoking "two to five joints" (he described a "joint" as being of regular cigarette size) of marihuana each day "to relieve frustrations and tensions and just have a mellow feeling to get through the day;" that he felt a "mental dependency" on this marihuana intake, for, if he didn't have it, he "would go into extreme cases of hypertension [he described this as a mental, rather than physical, state] and paranoia." The marihuana, he said, acted as a depressant on his nervous system and enabled him to relax.

He also testified that, while undergoing college examinations, in the same month, he took amphetamines to "work longer and study better." Then, on weekends, he took barbiturates to neutralize the affect of the amphetamines.

The defense counsel asked, "[W]hen it came time to talk to the recruiter for your enlistment in the service, what did you reveal to him concerning your drug usage?" McDonagh replied, "That I did drugs, and I specified what types; and I sold drugs [usually marihuana] to make money to buy drugs for myself."

When asked "What was the recruiter's response when you told him that?" McDonagh said, "He kind of hedged, and wanted to side-step the whole issue, and he said 'Don't make any mention of this[,'] as far as I could recollect."

Even so, McDonagh testified (and the record confirms) that he answered "yes" to question 37c on his Application for Enlistment, which was "Have you ever been involved in the use, purchase, possession or sale of marihuana, LSD, or any harmful or habit-forming drugs and/or chemicals except as prescribed by a licensed physician?" The "yes" answer was required to be explained in item 41, a space for "remarks." However, no entry was made in that item. McDonagh also testified that, as best he could recall, he also indicated his use of drugs on the medical history form he prepared for his physical examination, that he saw a doctor in connection with that examination, but that drugs were not discussed.

The recruiter, a staff sergeant, signed the Application for Enlistment form, as did McDonagh, on 3 January 1976. Another recruiter, a master sergeant, signed on 5 January as accepting the enlistment. No medical forms pertaining to the enlistment were offered or introduced into evidence at the trial.[4]

### B. The Conclusion Reached by the Trial Judge

The trial counsel requested a continuance to permit investigation whether McDonagh had been dependent upon drugs within the meaning of the regulation and whether the recruiter was informed of the impediment and facilitated the enlistment despite such knowledge. The military judge granted a continuance from 25 September 1979 until 5 November 1979. Further delays must have ensued, for the court did not again convene until 5 December. It met then at the request of the trial counsel to consider the impact of the amendments to Article 2 which had been enacted in the meantime on 9 November 1979 in the Department of Defense Authorization Act, 1980. The amendments redesignated the existing Article 2 as Article 2(a), and added Article 2(b) as follows:

(b) The voluntary enlistment of any person who has the capacity to understand

---

3. Army Regulation 40–501, Medical Service: Standards of Medical Fitness, par. 2–34 (5 December 1960 with amendments including Change 30, 27 August 1975). *See* Army Regulation 601–210, *supra*, par. 2–2 (table 2–1, rule E); Army Regulation 601–270, Personnel Procurement, Armed Forces Examining and Entrance Stations, par. 4–18a (1) (18 March 1969,

as amended). The military judge granted a defense motion for judicial notice of the pertinent regulations.

4. Litigation of the facts became unnecessary when the military judge ruled that McDonagh's enlistment, if invalid, had been validated by Article 2(b).

the significance of enlisting in the armed forces shall be valid for purposes of jurisdiction under subsection (a) of this section and a change of status from civilian to member of the armed forces shall be effective upon the taking of the oath of enlistment.[5]

In addition, because the Court of Military Appeals had held that a recruiter's misconduct, in addition to nullifying the enlistment, also precluded the Government from relying on the doctrine of subsequent constructive enlistment as a basis of jurisdiction,[6] the following was added as Article 2(c):

> (c) Notwithstanding any other provision of law, a person serving with an armed force who—
>
> > (1) submitted voluntarily to military authority;
> >
> > (2) met the mental competency and minimum age qualifications of sections 504 and 505 of this title [10 U.S.C. §§ 504, 505] at the time of voluntary submission to military authority;
> >
> > (3) received military pay and allowances; and
> >
> > (4) performed military duties;
>
> is subject to this chapter [the UCMJ] until such person's active service has been terminated in accordance with law or regulations promulgated by the secretary concerned.

10 U.S.C.A. § 802(c) (1980 Supp.), as added by sec. 801(a)(2), DoD Authorization Act, 1980, *supra* note 5.

Troubled about the retroactivity of these amendments, and in view of the constitutional prohibition of ex post facto laws,[7] the military judge requested briefs from the parties. In due course, the briefs were filed and oral arguments heard.[8]

The military judge concluded that the defense evidence raised a question of nonwaivable disqualification for enlistment by reason of habitual use of marihuana, made known to the recruiter and willfully concealed by him, and concluded that, if true, this would bring the case squarely within the *Russo* doctrine. However, he then ruled that, there being no question as to the appellant's capacity to contract or as to the voluntariness of his enlistment, the new Article 2(b) of the Uniform Code effectively overruled *Russo* so that he need no longer follow it. Pleas were entered and the trial proceeded to the conclusion previously mentioned.

### C. Applicability of the Russo Doctrine to McDonagh Enlistment

I agree that appellant's evidence was at least minimally sufficient to raise an issue as to in personam jurisdiction. McDonagh's contention that the purpose was to conceal the extent and frequency of his use of marihuana, although self-serving, is circumstantially supported by the absence of the required explanatory entry in item 41 and presence of the recruiting staff sergeant's certification in item 44 that he (the recruiter) had verified the data in the preceding sections as required by directives.

I further agree with the trial judge's conclusion that the facts depicted would, if true, bring McDonagh's enlistment squarely within the *Russo* holding that the fraudulent concealment by a recruiter of an applicant's nonwaivable disqualification for enlistment, in violation of Article 84, Uniform

---

5. 10 U.S.C.A. § 802(b) (1980 Supp.), as added by sec. 801(a)(2), DoD Authorization Act, 1980, Pub.L. 96–107, 93 Stat. 811. The "subsection (a)" mentioned is the former Article 2, now Article 2(a), listing the categories of persons subject to the Uniform Code of Military Justice, which includes "[m]embers of a regular component of the armed forces." 10 U.S.C.A. § 802(a)(1) (1980 Supp.).

6. *United States v. Brown*, 23 U.S.C.M.A. 162, 48 C.M.R. 778 (1974); *accord, United States v. Harrison*, 5 M.J. 476, 481 (C.M.A.1978); *United*

*States v. Russo*, 1 M.J. 134 (C.M.A.1975); *United States v. Barrett*, 1 M.J. 74 (C.M.A.1975).

7. U.S.Const. art. I, § 9, cl. 3; *see also id.*, art. I, § 10, cl. 1.

8. Oral arguments at the trial also discussed, as will we, whether the *Russo* doctrine had been modified by later opinions, such as *United States v. Stone*, 8 M.J. 140 (C.M.A.1979), which had been decided while McDonagh's trial was in progress.

Code of Military Justice, 10 U.S.C. § 884 (1976), renders the enlistment void as a basis for criminal jurisdiction. *United States v. Russo, supra*, 1 M.J. at 136–37.[9]

Trial and appellate counsel for the Government have argued that the *Russo* decision had been substantially modified so that McDonagh's case no longer came within it. I cannot subscribe to that view. In one of the cases urged upon us, *United States v. Valadez*, 5 M.J. 470 (C.M.A.1978), the Court of Military Appeals only clarified *Russo* by indicating that mere negligence on the part of recruitment officials does not constitute a violation of Article 84 and does not bring the enlistment within *Russo*. In other respects, however, the opinion went to some length to explain and support the *Russo* decision. In another of the cases, *United States v. Stone*, 8 M.J. 140 (C.M.A. 1979), involving a disqualification made waivable by the existing regulation, the Court further refined the *Russo* doctrine by holding that, since the enlistment was not absolutely prohibited because the disqualification was waivable, even deliberate failure of a recruiter to seek a waiver would not invalidate an enlistment. The precedential value of the opinion is open to question, for it expresses the view of only one of the two judges sitting at the time. In any event, it marks no clear retreat from the same author's *Russo* opinion holding an enlistment void when regulations establishing the disqualification did not authorize a waiver.[10]

Because Judge Foreman agrees with my conclusion that *Russo* would otherwise apply, we must assess the impact of the amendments to Article 2, by which the Congress intended to overcome the effect of *Russo* and related decisions.

## D. Application of Article 2 Amendments to Existing Enlistments.

[T]he first rule of [statutory] construction is that legislation must be considered as addressed to the future, not to the past. The rule is one of obvious justice and prevents the assigning of a quality or effect to acts or conduct which they did not have or did not contemplate when they were performed. The rule has been expressed in varying degrees of strength but always of one import, that a retrospective operation will not be given to a statute which interferes with antecedent rights or by which human conduct is regulated, unless such be 'the unequivocal and inflexible import of the terms, and the manifest intention of the legislature.'

*Union Pacific R. R. v. Laramie Stock Yards Co.*, 231 U.S. 190, 199, 34 S.Ct. 101, 102, 58 L.Ed. 179 (1913) (citations omitted); *accord, Greene v. United States*, 376 U.S. 149, 160, 84 S.Ct. 615, 621, 11 L.Ed.2d 576 (1964).

In a case involving an amendment made by Congress to overcome the interpretation given to a statute in two of the federal

---

**9.** *Russo's* rationale is that the common law of contracts applies to the formation of enlistment contracts, even though it does not apply to other aspects of enlistment because of the change of status involved; that under the common law the courts will not enforce or recognize a contract that is contrary to public policy; and that an enlistment effected through criminal conduct in violation of Article 84 is contrary to public policy. Article 84 proscribes effecting the enlistment of any person known to be ineligible because the enlistment is "prohibited by law, regulations, or order." Later, in *United States v. Stone*, 8 M.J. 140 (C.M.A. 1979), the *Russo* doctrine was limited to cases involving nonwaivable defects (and may, therefore, no longer encompass all violations of Article 84).

**10.** *Stone* involved Navy recruiting regulations that required a waiver from proper authority

before enlisting an applicant who had used marihuana. Instead of seeking a waiver, the recruiter concealed the applicant's use of marihuana. Then Chief Judge Fletcher's opinion says, "[W]e will not extend the coverage of the *Russo* doctrine to those situations involving waivable regulatory disqualifications." 8 M.J. at 142. It is because the *Russo* doctrine rests upon Article 84, which concerns enlistments prohibited by regulation as well as by statute, that I believe that *Russo* continues to apply to cases such as this one, involving disqualifications which the regulation made nonwaivable, even though such regulations (and statutes, too) might be changed. *Contra, United States v. Quintal*, 10 M.J. 532, 536 (A.C.M.R.1980) (Jones, Sr. J., concurring). Moreover, even if *Stone* had overruled *Russo*, a question as to its retroactivity would nevertheless need to be resolved. *See* Note, 47 Harv.L.Rev. at 1408 n.33.

circuits, a district court, after holding that the amendment could not be considered a mere declaration of existing law, but had instead effected a change, said that—

> Since the 1951 amendment cannot be considered as merely declaratory, the general rule of statutory construction applicable in this case is that the amendment must be given only prospective effect because there is nothing, either explicitly or implicitly, contained in the act indicating that it should be applied retrospectively.

*Peony Park, Inc. v. O'Malley,* 121 F.Supp. 690, 693–94 (D.Neb.1954), *aff'd,* 223 F.2d 668 (8th Cir.), *cert. denied,* 350 U.S. 845, 76 S.Ct. 87, 100 L.Ed. 753 (1955) (court of appeals decisions held dance halls subject to cabaret tax because they served food; Congress amended statute to expressly make tax inapplicable when food service was only incidental).

As in *Peony Park,* the amendments to Article 2 changed the law. In this case, however, it is manifestly clear that Congress intended the changes have retrospective effect to the extent of operating on enlistments, or purported enlistments, already in being.

Evidence that the amendments worked a change in the law stems from the fact that, until they were enacted, courts-martial and the Courts of Military Review were bound to follow the Court of Military Appeals' interpretation of *In re Grimley* and Article 84.[11] Indeed, the congressional committee considering the proposed amendments was given a list of cases that had been dismissed or reversed because of the *Russo* decision.[12] However, that the Article 2 amendments were proposed with retroactivity in mind is clear from the following testimony of the General Counsel of the Department of Defense:

> [I]t is our view that the amendments apply to all individuals who are on active duty on the date of the enactment.... They apply to all offenses whenever they are committed consistent with the double jeopardy provisions of the Uniform Code.... Because neither one of these amendments expands the current statutory authority, we find no problem of possible reaching back to past offenses.... [They simply provide] a greater level of detail than the current statutory grant of jurisdiction to courts-martial.[13]

Similarly, The Judge Advocate General of the Navy testified that—

> The proposed new subsection (b) ... is intended to be applicable to all members of the armed forces currently on active duty, assuming at the time of their enlistment they had the capacity to enlist and did so voluntarily. This new subsection (b) does not create new law or set new standards for determining the validity of an enlistment for UCMJ jurisdiction purposes, for it merely codifies the 1890 Supreme Court case of *In re Grimley* and reaffirms Congressional intent in this area.[14]

---

11. *See United States v. Heflin,* 1 M.J. 131, 132 n.6 (C.M.A.1975); *cf. Peony Park, Inc. v. O'Malley, supra,* 121 F.Supp. at 693 n.2.

12. Amendments to Articles 2 and 36, Uniform Code of Military Justice: Hearings Before the Military Personnel Subcomm. of the House Armed Services Comm., 96th Cong., 1st Sess. 43–44, 56–57, 65–67 (1979) [hereinafter cited as House Hearings].

13. House Hearings, *supra* note 12, at 13–14 (statement of Deanne C. Siemer). Whether the amendments can relate to *offenses* occurring before the date of enactment, as Ms. Siemer indicated, will be discussed *infra.* Ms. Siemer may have had in mind the principle that the judicial overruling of a prior opinion generally is retroactive. 21 C.J.S. *Courts* § 194a (1940). Whatever may be the case with judicial opinions—*see* Note, 47 Harv.L.Rev. at 1408 n.33—legislative action is circumscribed by the ex post facto prohibition. *See United States ex rel. Almeida v. Rundle,* 255 F.Supp. 936, 944–45 (E.D.Pa.1966), *aff'd,* 383 F.2d 421 (3d Cir. 1967), *cert. denied,* 393 U.S. 863, 89 S.Ct. 144, 21 L.Ed.2d 131 (1968). *See also,* 21 C.J.S. *Courts* § 194a at 328 n.98 (1940); 20 Am.Jur.2d *Courts* §§ 234, 236 (1965).

14. House Hearings, *supra* note 12, at 26–27 (statement of Rear Adm. Charles E. McDowell). The Judge Advocate General of the Army also indicated retroactivity when he stated that "[t]his legislative proposal is necessary to *preserve* court-martial jurisdiction over individuals who *enlisted* under fraudulent circumstances." *Id.* at 17, 20 (statement of Maj. Gen. Wilton B. Persons, Jr.) (emphasis added).

Admiral McDowell further commented specifically on subsection 2(c) (*i. e.,* Article 2(c)) as follows:

If, however, for some reason, it is determined that the proposed new subsection (b) has only prospective application, it will nevertheless accomplish its major goal of statutorily defining what constitutes a valid initial enlistment for UCMJ jurisdiction purposes. Furthermore, if the proposed new subsection (b) is held to be prospective only, then the proposed new subsection (c) will resolve the immediate problem, as it will be applicable to all members of the armed forces currently on active duty, who meet its four-part test, which should occur on the first pay day *after enactment* of this legislation.

House Hearings, *supra* note 12, at 27 (emphasis added).

Meanwhile, the Senate Armed Services Committee, in whose bill the amendments ultimately were enacted, had focused on the existing situation under which members of the armed forces could raise the issue of recruiter malpractice for the first time after committing an offense, thereby shift to the Government the burden of proving lack of recruiter misconduct, possibly escape military jurisdiction, and remain immune from military discipline while awaiting administrative disposition. Referring to this as a "serious problem" and "intolerable," the committee said that it strongly believed that the *Russo* doctrine served no useful purpose and severely undermined discipline and command authority, and reported that the purpose of the amendments was "to overrule *United States v. Russo* ... by reaffirming the law as set forth by the

Supreme Court in *In re Grimley*, 137 U.S. 147 [11 S.Ct. 54, 34 L.Ed. 636] (1890)." S.Rep.No.96–197, 96th Cong., 1st Sess. 121–22 (1979) *reprinted in* [1979] U.S.Code Cong. & Ad.News 1818, 1826–27.

█ With approximately 1.7 million enlisted men and women already serving in the armed forces, and with perhaps as many as one half of them serving a first enlistment, it is apparent that the legislative purpose scarcely could be realized if the amendments would not apply to enlistments already made.[15] Reading the language of the amendments in the light of the conditions that necessitated their passage leads irresistably to the conclusion that Congress intended them to apply to existing enlistments such as McDonagh's.

This conclusion does no violence to the intention of the contracting parties, for it is not contended that McDonagh or his recruiter intended any result other than a de jure enlistment which would subject McDonagh to military discipline, as well as conferring military benefits.[16] Apposite, too, are the following words of Mr. Justice Black in *McNair v. Knott*, 302 U.S. 369, 373, 58 S.Ct. 245, 247, 82 L.Ed. 307 (1937): "No party who has made an illegal contract has a right to insist that it remain permanently illegal. . . . No person has a vested right to be permitted to evade contracts which he has illegally made."

Giving retroactive effect to legislative acts designed to change the judicial interpretation of a statute has been criticized as being contrary to the American constitutional doctrine of separation of powers.[17]

**15.** *See* Dept. of Defense, *DEFENSE/80,* July 1980 at 17, 20. Applicability to fraudulent enlistments already made, however few in number, also is consistent with Congress' expressed expectation that the services would act to eliminate them in the future or provide mechanisms for raising the issue prior to criminal conduct.

**16.** A legislative ratification of prior enlistments is somewhat like curative legislation, which generally is held to be retroactive. *See* 2 J. Sutherland, Statutes and Statutory Construction § 41.11 (4th ed. 1973) [hereinafter cited as 2 Sutherland]; 82 C.J.S. *Statutes* § 430 (1952); 16A C.J.S. *Constitutional Law* §§ 421 *et seq.*

(1956); *see Silverlight v. Huggins,* 347 F.Supp. 895, 898 (D.V.I.1972), *rev'd in part on other grounds,* 488 F.2d 107 (3d Cir. 1973).

**17.** *Johnson v. Morris,* 87 Wash.2d 922, 557 P.2d 1299, 1303 n.3 (1976) (en banc); 1A J. Sutherland, Statutes and Statutory Construction, §§ 26.07, 27.04 (4th ed. 1972); 82 C.J.S. *Statutes* § 431 at 1005 n.36 (1952); *see* Crosskey, *The True Meaning of the Constitutional Prohibition of Ex Post Facto Laws,* 14 U.Chi.L.Rev. 539, 555–56 (1947) (discussing the 1792 Virginia case of *Turner v. Turner's Executrix* ); *cf. United States v. Stafoff,* 260 U.S. 477, 480, 43

We need not plumb the depths of those precedents for they do not apply to the situation before us. The United States Court of Military Appeals, whose judicial interpretation was changed by legislative act, is a legislative court. Its authority is derived from the Congress under Article I, rather than being conferred by the judicial article of the Constitution.[18] Therefore, the constitutional separation of powers is not involved.

Accordingly, I conclude that pursuant to Article 2(b), military jurisdiction attaches to enlistments such as McDonagh's as of the date the oath of enlistment was taken even though that date preceded amendment of the statute. It is apparent that my brothers agree. Because of our view as to Article 2(b), we need not decide whether a constructive enlistment could arise, assuming that McDonagh met the four-part test of Article 2(c) before commission of the offenses with which he was charged. However, I must assume that a constructive enlistment would arise under those circumstances for the purposes of my consideration of whether either Article 2(b) or 2(c) will permit the exercise of court-martial jurisdiction over offenses committed before their enactment.

### E. Ex Post Facto Effect of Articles 2(b) and 2(c).

Definition of the Constitutional prohibition against the passage of ex post facto laws frequently begins with the following comments of Mr. Justice Chase in *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 390, 1 L.Ed. 648 (1798):

I will state what laws I consider *ex post facto* laws, within the words and the intent of the prohibition. 1st. Every law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2d. Every law that aggravates a crime, or makes it greater than it was, when committed. 3d. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and receives less, or different testimony, than the law required at the time of the commission of the offense, in order to convict the offender. All these, *and similar laws* [emphasis added], are manifestly unjust and oppressive. In my opinion, the true distinction is between *ex post facto* laws, and retrospective laws. Every *ex post facto* law must necessarily be retrospective; but every retrospective law is not an *ex post facto* law: the former only are prohibited.

A more recent expression by the Supreme Court is as follows:

Article I, § 10, of the United States Constitution prohibits a State from passing any 'ex post facto Law.' Our cases have not attempted to precisely delimit the scope of this Latin phrase, but have instead given it substance by an accretion of case law. In *Beazell v. Ohio*, 269 U.S. 167, 169–170 [46 S.Ct. 68, 69, 70 L.Ed. 216] (1925), Mr. Justice Stone summarized for the Court the characteristics of an *ex post facto* law:

'It is settled, by decisions of this Court so well known that their citation may be dispensed with, that any statute which punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with

S.Ct. 197, 199, 67 L.Ed. 358 (1923); *Peony Park, Inc. v. O'Malley, supra,* 121 F.Supp. at 694. *But cf. Harisiades v. Shaughnessy,* 342 U.S. 580, 593–96, 72 S.Ct. 512, 520–522, 96 L.Ed. 586 (1952); *Jordan v. Roche,* 228 U.S. 436, 445–46, 33 S.Ct. 573, 575–576, 57 L.Ed. 908 (1913); E. Crawford, The Construction of Statutes § 74 (1940); 82 C.J.S. *Statutes* § 431 at 1005 n.32 (1952); 2 Sutherland, *supra* note 16, § 42.03 at 317 n.6.

18. *See* [1976–1977] USCMA Annual Report 5–6 (1979); *cf. United States v. Frischholtz,* 16 U.S. C.M.A. 150, 151–52, 36 C.M.R. 306, 307–08 (1966); *United States v. Armbruster,* 11 U.S.C. M.A. 596, 598, 29 C.M.R. 412, 414 (1960). As for the Article III courts the amendments were designed to comport with, rather than overrule, the Supreme Court's opinion in *In re Grimley,* 137 U.S. 147, 11 S.Ct. 54, 34 L.Ed. 636 (1890).

crime of any defense available according to law at the time when the act was committed, is prohibited as *ex post facto*.' *Dobbert v. Florida*, 432 U.S. 282, 292, 97 S.Ct. 2290, 2297, 53 L.Ed.2d 344 (1977).[19]

Measuring the impact of Articles 2(b) and (c) against that "accretion of case law" referred to in *Dobbert v. Florida, supra*, I conclude that applying them in such a fashion as to establish military in personam jurisdiction which did not otherwise exist at the time of appellant's misconduct would violate the ex post facto prohibition.[20]

I must admit that, in terms, neither subsection defines a crime or imposes or enlarges any punishment. Article 2(b) merely defines the requisites of a valid (*i. e.*, not void ab initio) enlistment and Article 2(c) makes statutory the longstanding doctrine of constructive enlistment. The intent is to exclude recruiter misconduct as a factor in either determination. However, it is their ultimate effect, rather than wording, which determines their ex post facto nature. *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 327, 18 L.Ed. 356 (1867); *see Harisiades v. Shaugnessy*, 342 U.S. 580, 595, 72 S.Ct. 512, 521, 96 L.Ed. 586 (1952). That effect, as well as the declared purpose, is to enable criminal punishment in cases in which criminal punishment formerly could not be imposed.

McDonagh's drug trafficking scarcely can be said to have been "innocent when done," to use Justice Chase's term. Presumably he could have been tried in the local civilian courts. However, he could not be punished under the Uniform Code of Military Justice, and similar attempts to impose Federal jurisdiction after the fact have run afoul of the ex post facto prohibition. *See Woxberg v. United States*, 329 F.2d 284 (9th Cir.), *cert. denied*, 379 U.S. 823, 85 S.Ct. 45, 13 L.Ed.2d 33 (1964) (statute making Federal crime of conduct which was only State crime when done); *cf. United States v. Starr*, 27 F.Cas. 1296 (C.C.D.Ark.1846) (No. 16,379) (attempt to enlarge geographical jurisdiction retroactively); *but cf. Cook v. United States*, 138 U.S. 157, 11 S.Ct. 268, 34 L.Ed. 906 (1891) (seemingly involves venue rather than jurisdiction).

One practical effect of the Article 2 amendments is to relieve the Government of its burden of proving jurisdictional facts when an accused demonstrates a reasonable possibility that his enlistment was invalid due to recruiter misconduct. *See United States v. Jessie*, 5 M.J. 573 (A.C.M.R.), *pet. denied*, 5 M.J. 300 (C.M.A.1978). Retroactively shifting the burden of proof seems impermissible. *Cf. United States v. Williams*, 475 F.2d 355 (D.C.Cir.1973) (statute shifting Government's burden of proving defendant's sanity, when issue raised, so as to require defendant to prove insanity).

Yet another way of looking at the amendments is that, in cases such as this one, they deprive an accused of a defense to criminal charges under the Uniform Code, *viz.*, lack of military status. Depriving "one charged with crime of any defense available according to law at the time when the act was committed, is prohibited as *ex post facto*." *Beazell v. Ohio*, 269 U.S. 167, 169–70, 46 S.Ct. 68, 69, 70 L.Ed. 216 (1925).

The Government has urged, both at the trial and before this Court, that the Article 2 amendments are merely procedural and therefore not subject to the ex post facto prohibition. The trial counsel relied upon *Thompson v. Missouri*, 171 U.S. 380, 18 S.Ct. 922, 43 L.Ed. 204 (1898), which involved a statute making admissible certain evidence as to the genuineness of a disputed docu-

---

**19.** It also has been stated that an ex post facto law is any law enacted after the event which, "in relation to the offense or its consequences, alters the situation of a party, to his disadvantage." *Duncan v. Missouri*, 152 U.S. 377, 382, 14 S.Ct. 570, 571, 38 L.Ed. 485 (1894). Although this definition was quoted with approval by the Court of Military Appeals in *United States v. Hise*, 20 U.S.C.M.A. 3, 4, 42 C.M.R. 195, 196 (1970), and aptly describes the impact of the new Articles 2(b) and 2(c), I am reluctant to base my conclusions on a definition so broad. *See United States v. Dowdy*, 41 C.M.R. 521, 523 n.3 (A.C.M.R.1969).

**20.** This does not mean that Articles 2(b) and (c) are not valid as to offenses committed after their enactment. *See* 16A C.J.S. *Constitutional Law* § 436 n.11 (1956).

ment, which evidence had not been admissible when the defendant's crime was committed. Appellate government counsel have referred us to *Duncan v. Missouri*, 152 U.S. 377, 14 S.Ct. 570, 38 L.Ed. 485 (1894), involving an amendment to the Missouri constitution which, following Duncan's offense, changed the supreme court of that state from a single, five-judge panel to a seven-judge court sitting in two divisions, so that the appellate court existing at the time of his offense was no longer available. Neither change was held to violate the Federal constitutional prohibition against ex post facto laws.

I am unable to equate the substantial impact of the amendments to Article 2 with mere changes in evidentiary rules and modes of procedure.[21] The expansion of court-martial jurisdiction has been guarded closely by the Supreme Court,[22] and the reinstitution of military jurisdiction where it had ceased to exist is no mere matter of procedure.[23]

I am aware that a different panel of this Court has reached a contrary conclusion involving Article 2(c), relying on the doctrine that an appellate court must apply the law in effect at the time it renders its decision even though the law was different when the offenses were committed. *United States v. Quintal*, 10 M.J. 532, 535 (A.C.M.R. 1980). That doctrine is indeed well-established. *De Rodulfa v. United States*, 461 F.2d 1240, 1250–51 nn. 50–56 (D.C.Cir.), *cert. denied*, 409 U.S. 949, 93 S.Ct. 270, 34 L.Ed.2d 220 (1972). In criminal cases, however, the principle is subject to the constitutional limitation against ex post facto laws. *Virgin Islands v. Civil*, 591 F.2d 255, 258 (3d Cir. 1979).

The panel did not discuss the ex post facto prohibition, but characterized the *Russo* doctrine as follows:

[I]nsofar as it prevents the Government from establishing jurisdiction by showing a constructive enlistment, [it] is a prophylactic policy rule, devised by the Court of Military Appeals for the purpose of guarding against recruiter misconduct, rather than a legal principle found by that Court in the Constitution, any statute, or legal precedent.

*United States v. Quintal, supra,* 10 M.J. at 535.

I do not fully agree with *Quintal's* description of either the origin or nature of the constructive enlistment estoppel rule. The rule did not originate in *Russo*, but instead found its first expression in Chief Judge Duncan's opinion in *United States v. Brown*, 23 U.S.C.M.A. 162, 48 C.M.R. 778 (1974). There, it rested in part on the already established doctrine that, in asserting jurisdiction on account of military status, the government will be held to strict compliance with its own regulations. Earlier, in *Catlow*, the Court of Military Appeals had recognized that recruiter misconduct did not necessarily preclude a constructive enlistment from arising. The estoppel in *Brown* was based not upon recruiter misconduct, which was not involved, but upon the view that, when the 16-year-old enlistee turned 17, so that a constructive enlistment might arise, the government had been unreasonably failing to comply with its own regulations for disposition of enlistees under 17.

When one considers *Brown* together with *Russo* and the cases of *United States v. Barrett*, 1 M.J. 74 (C.M.A.1975), and *United States v. Harrison*, 5 M.J. 476, 481 (C.M.A.

---

**21.** For an excellent collection of cases considering procedural matters, see *People v. Martinez*, 82 Misc.2d 56, 368 N.Y.S.2d 699, 703–09 (Sup. Ct.1975).

**22.** See e. g., *Kinsella v. Singleton*, 361 U.S. 234, 80 S.Ct. 297, 4 L.Ed.2d 268 (1960); *McElroy v. Guagliardo*, 361 U.S. 281, 80 S.Ct. 305, 4 L.Ed.2d 282 (1960). This is not meant to suggest that the Supreme Court would have approved the *Russo* doctrine.

**23.** *Cf. United States ex rel. Toth v. Quarles*, 350 U.S. 11, 76 S.Ct. 1, 100 L.Ed. 8 (1955) (court-martial jurisdiction after discharge); *United States v. Fleming*, 2 C.M.R. 312, 318 (A.B.R. 1951) (Article 3(a), UCMJ, not retroactive) (by implication); *cf. also Clements v. United States*, 266 F.2d 397, 399 n.4 (9th Cir. 1959) (extension of statute of limitations).

1978), it appears that the estoppel doctrine turns on the reasonableness of the government's efforts to comply with its regulations requiring termination of certain enlistments, rather than on a purpose of preventing original recruiter misconduct. In any event, to say, as in *Quintal*, that the estoppel doctrine rests on no legal principle found in the Constitution, statutes, or precedents, does not relieve the doctrine of its jurisdictional significance.

I would hold that applying Article 2(b), so as to authorize trials by court-martial for offenses committed before its enactment is prohibited by the ex post facto clause even though the Article is otherwise applicable to purported enlistments made earlier. Assuming that, despite Admiral McDowell's possibly narrower interpretation quoted earlier, Article 2(c) might recognize a constructive enlistment based on conditions arising before its enactment, I likewise would conclude that neither may that subsection operate ex post facto to permit trial for an offense occurring before its enactment.[24] Since, as previously indicated, my brothers do not join me, these conclusions do not control our disposition of this case.

## II. Plea Providency

McDonagh's remaining assigned error is based on his counsel's description of the plea bargaining process. McDonagh had entered into a written agreement with the convening authority, Lieutenant General Becton, to plead guilty as charged in return for General Becton's promise to approve no sentence in excess of a dishonorable discharge, confinement at hard labor for 30 months (the maximum imposable being 40 years), total forfeitures, and reduction to the lowest enlisted grade. Except for appellant's agreement to stipulate with the trial counsel as to the facts surrounding the

offense, which was done, there were no other terms or conditions.

The military judge conducted a plea bargain inquiry as required by *United States v. Green*, 1 M.J. 453, 456 (C.M.A.1976). When he asked, "Are there any other agreements in existence that have not been brought to the attention of this court?" the trial counsel inexplicably said that he was aware of none. The defense counsel, however, responded as follows:

> Your Honor, there is such an agreement. If I may flush out [sic; probably 'flesh out'] the facts of that very briefly, while negotiating with the people at VII Corps SJA concerning the quantum of punishment, we discussed some requests for witnesses in extenuation and mitigation, all of whom are now in the States. [The trial was to be at Nellingen, Germany.] There was reluctance on the part of VII Corps to enter into the agreement. I discussed the matter with Specialist McDonagh, who was present in the room while the negotiation was going on. It was my opinion, in which he concurred, that his interests on sentencing could be protected equally well in this case by stipulations of expected testimony. With that understanding, we informed the people at VII Corps that we did not intend to request the live presence of those witnesses from the States. It was our position that it was in my client's best interests when we agreed to enter into the particular agreement set forth here. I do not know whether the convening authority was personally informed of that [25], but it was the subject of agreement between myself and people at VII Corps Staff Judge Advocate [Office].

The defense counsel then produced five stipulations of expected testimony (Defense

---

**24.** I would, however, order a limited hearing rather than dismiss the charges. Normally, when the Government has not met its burden of affirmatively establishing jurisdiction over an accused, dismissal of the charges is required. *United States v. Barrett*, 1 M.J. 74, 75 (C.M.A.1975). This case is different. Because the military judge ruled in favor of the Government as to the applicability of amendments to

Article 2, the Government was not called upon to contest the facts. Note 4 and Part I.B., *supra*. This was recognized by the trial defense counsel who noted in his argument "that the government still has the option to challenge the factual predicate." Record at 52.

**25.** Nor do we, for the question was never asked or answered at the trial.

Exhibits A through E), and said, "We are satisfied that they will protect my client's interests." Assuring himself that the witnesses, if called, would have been called only after findings, and not on the merits, the military judge ascertained from McDonagh that he had entered into the stipulations voluntarily, understood that the court members could believe them in whole or part, or disbelieve them, and was satisfied with the arrangements his counsel made with the staff judge advocate and the convening authority.

When the six court members were empaneled for the sentencing portion of the proceedings, the defense counsel questioned them about stipulations. He asked whether any would feel that a stipulation of expected testimony did not "carry as much weight" as the live testimony of witnesses brought back from the United States, and whether any of them would assume that the defense, by stipulating, indicated that it did not attach importance to the evidence. There were no affirmative replies.

The five stipulations, introduced with appropriate instructions by the judge and read to the court members, were the expected testimony of a soldier who had been the confidential informant in the cocaine transactions, three successive platoon leaders under whom McDonagh had served in Germany, and the officer-in-charge of a special project in which McDonagh had been involved. The informant's testimony was that someone other than McDonagh was the prime target of the drug operation and that McDonagh was only a "steppingstone" to apprehension of the supplier. The platoon leaders spoke warmly of McDonagh's performance of duty, as did the other officer, but commented on the negative effect of his association with known drug users. After introduction of other exhibits, McDonagh presented evidence in his own behalf by reading aloud an unsworn statement in which he recounted his drug usage since eleventh grade, the ups and downs of his

attitude towards the Army, and the beneficial effects of recent religious experience. The genuineness of the latter was attested to by a local chaplain, whose letter also was read to the court members.[26]

The sentence imposed by the court members included a dishonorable discharge, confinement at hard labor for 10 years, forfeiture of all pay and allowances, a fine of $500.00 (with confinement of up to 180 days if the fine were not paid), and reduction to the grade of Private E–1.

■ An accused may not be deprived of the right to the testimony of material witnesses on his behalf for the sentencing portion of his trial, although "occasionally some alternate form of testimony [to live testimony] will pass muster under the facts and circumstances of a given case." *United States v. Scott*, 5 M.J. 431, 432 (C.M.A. 1978); *accord, United States v. Courts*, 9 M.J. 285 (C.M.A.1980).

■ Within the bounds of materiality, availability, and some limit to cumulativeness, however, the decision whether to call any witnesses, which ones to call, and whether to present the testimony live or otherwise, is for the accused. The accused may, for any of a variety of reasons, decide not to exercise a right to live testimony. *See, e. g., United States v. Sargent*, 9 M.J. 915 (A.C.M.R.1980) (accused abandoned request for personal appearance of witnesses contingent upon immediate trial). The question is whether doing so incident to a plea bargain is either contrary to public policy or otherwise makes the guilty plea improvident. We think not.

■ For the reasons suggested in Judge Baum's dictum in *United States v. Hanna*, 4 M.J. 938, 940 (N.C.M.R.1978), we do not believe that waiving a request for the personal appearance of witnesses whose appearance possibly could be compelled, in favor of presenting stipulations of expected testimony, is contrary to public policy.[27]

---

**26.** There is no indication that the chaplain was not locally available to testify in person.

**27.** *Compare United States v. Mills*, 9 M.J. 687 (A.C.M.R.), *pet. granted*, 9 M.J. 283 (C.M.A. 1980), involving an agreement to substitute

Also, we believe that the obvious foresight given to the matter by the defense counsel and the careful and solicitous inquiry conducted by the military judge in this case firmly establish the providence of McDonagh's plea of guilty.[28]

In view of my brothers' holding on the jurisdictional issue and our unanimous view as to the providency issue: the findings of guilty and the sentence are affirmed.

FOREMAN, Judge, concurring in part and dissenting in part:

■ I agree with Senior Judge Fulton that, under the rules promulgated in *Russo* and its progeny, a court-martial would have been without jurisdiction over the appellant, but for the amendments to Article 2, Uniform Code of Military Justice. I also agree that the amendments to Article 2 apply retroactively to validate enlistments contracted before the date of its enactment. However, I disagree with his conclusion that applying the amendments to offenses committed before the effective date violates the ex post facto prohibition of Article I, Section 9 of the Constitution.

The effect of the amendments to Article 2 is to establish the jurisdiction of courts-martial over persons who otherwise would be immune from prosecution because of fraudulent acts by military recruiters. In *Cook v. United States*, 138 U.S. 157, 183, 11 S.Ct. 268, 275, 34 L.Ed. 906 (1891), the Supreme Court held that the ex post facto prohibition was not violated by a statute enacted in 1889 extending the jurisdiction of a circuit court of the United States to a homicide which had occurred in 1888, in what previously was a "No Man's Land," apparently not subject to the jurisdiction of any court.

In the *Cook* case there was some question whether the statute of 1889 established jurisdiction over an area previously not subject to the jurisdiction of any court, or transferred jurisdiction from another court. However, the Court decided that it was unnecessary to resolve that issue, because Congress had the authority to do either. *Cook v. United States*, 138 U.S. 157, 172, 11 S.Ct. 268, 271, 34 L.Ed. 906 (1891). Of course, the defendant could have been tried in Kansas, where he was apprehended, under the authority of the act of April 30, 1790, providing for trial "in the district where the offender is apprehended, or into which he may first be brought." 1 Stat. 114, c. 9, § 8. The question of jurisdiction over the same "No Man's Land" had been addressed earlier by the Circuit Court for the District of Kansas, which held that the statute of 1889 conferred jurisdiction on the Eastern District of Texas for a murder committed in 1888. *In re Jackson*, 40 F. 372 (C.C.D.Kansas 1889).

Accordingly, I believe that the ex post facto provisions of the Constitution do not prohibit the Congress from extending the jurisdiction of courts-martial so as to bring within their jurisdiction crimes already committed. As pointed out by Justice Gray in *Post v. United States*, 161 U.S. 583, 586, 16 S.Ct. 611, 612, 40 L.Ed. 816 (1896): "[I]t is indisputably within the discretion of the legislature, when granting, limiting, or redistributing jurisdiction, to include offenses committed before the passage of the act."

Furthermore, subjecting the appellant to trial by a court-martial instead of a civilian court does not violate the ex post facto prohibition, notwithstanding the differences

stipulated testimony for personal appearance of witnesses in extenuation and mitigation in return for deferment of confinement (review was granted on another aspect of the agreement), *with United States v. Smith*, 9 M.J. 537, 538 n.2 (A.C.M.R.), *pet. denied*, 9 M.J. 186 (C.M.A.1980), discussing waiver of right to present any evidence at all in extenuation and mitigation.

**28.** An element of discretion is necessarily and appropriately involved. "Where the plea bar-

gain encompasses conditions which the trial judge believes violate either appellate case law, public policy, *or the trial judge's own notions of fundamental fairness*, he should, on his own motion, strike such provisions from the agreement with the consent of the parties." *United States v. Elmore*, 1 M.J. 262, 264 (C.M.A.1976) (Fletcher, C. J., concurring in result) (emphasis added), quoted with approval in *United States v. Green*, 1 M.J. 453, 456 (C.M.A.1976) (Fletcher, C. J.).

in the rules of evidence, procedure, and composition of the court. A change in the rules of evidence is not ex post facto, even if it makes evidence admissible which was not admissible at the time of the offense. *Thompson v. Missouri*, 171 U.S. 380, 18 S.Ct. 922, 43 L.Ed. 204 (1898). A change in procedural rules is not ex post facto, even if it works to the disadvantage of the accused. *Dobbert v. Florida*, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977). Lastly, a change in the composition of the court is not ex post facto. *Duncan v. Missouri*, 152 U.S. 377, 14 S.Ct. 570, 38 L.Ed. 485 (1894).

The amendments to Article 2 do not create a new offense, lessen the government's burden of proof, deprive the appellant of a defense, or increase the punishment for the offenses. They do subject the appellant to the jurisdiction of a court-martial, along with the rules of evidence and procedure prescribed for courts-martial. As such the amendments are not ex post facto with respect to offenses committed before the date of enactment.

I would affirm the findings of guilty and the sentence.

CLAUSE, Judge, concurring in part and dissenting in part:

■ I fully concur in the reasoning and opinion of Judge Fulton that the amendment to Article 2, Uniform Code of Military Justice, is retroactive to enlistments contracted before enactment of the amendment.[1] However, I do not agree with his conclusion that to apply the amendment in this case would constitute an impermissible ex post facto application. In this respect I fully concur in the reasoning and opinion of Judge Foreman that application of the amendment does not violate the ex post facto provision of the Constitution.

The retroactive application of the amendment to crimes committed before their enactment violates neither the intent nor spirit of the Constitution. I am satisfied that Congress intended that the amendments to applied retroactively.

1. I likewise concur as to the question of the providency of appellant's pleas.

It is clear from a review of the *Russo* decision and its progeny that the rule announced therein had as its base public policy considerations. As Chief Judge Fletcher stated in *Russo*:

Because fraudulent enlistments are not in the public interest, we believe that common law contract principles appropriately dictate that where recruiter misconduct amounts to a violation of the fraudulent enlistment statute, as was the situation here, the resulting enlistment is void as contrary to public policy. Hence the change of status alluded to in *Grimley* never occurred in this case.

The author judge said in his statement on the proposed amendment made before the House of Representatives, Military Personnel Subcommittee of the Committee on Armed Services, that his thinking in *Russo* went to "social" considerations. The public policy base is also clear from the statement of Judge Cook before the same subcommittee. He stated:

I conclude that, in operation, *Russo* was destroying, not promoting, the public policy considerations upon which it was predicated. I also determined that I would publicly declare my conviction at the first opportunity. That opportunity is now.

Congress has now expressed itself by enacting the amendment to Article 2, which has the effect of reaffirming the rule announced by the United States Supreme Court in *In re Grimley*, 137 U.S. 147, 11 S.Ct. 54, 34 L.Ed. 636 (1890). The wisdom of that rule and the consequence of the deviation therefrom on social grounds should now be apparent to all.

Just as courts can make decisions based upon public policy considerations, they can determine to reverse those decisions. I believe that the Court of Military Appeals should review its *Russo* decision, overrule it, and reaffirm the traditional interpretation of *Grimley*.[2] As Judge Cook stated in his

2. Appearing as Chairman of the American Bar Association's Standing Committee on Military

opinion (concurring in the result) in *United States v. Banks*, 7 M.J. 92, 94 (C.M.A.1979), "[w]hen a rule has outlived its purpose or experience demonstrates it is seriously flawed in operation, certainly it should be vitiated or altered, as the situation requires." This outcome would avoid any consideration of the retroactivity of the Article 2 amendments.

I join in affirming the decision in this case.

Law, prior to his appointment as Chief Judge of the Court of Military Appeals, Chief Judge Everett stated before the same House subcommittee mentioned above:

Dealing first with the proposed amendment of Article 2, I perceive no objection to establishing already by statute that if someone voluntarily enlists in the Armed Services, then he is subject to military criminal jurisdiction. For many years military lawyers—relying on *U. S. v. Grimley*, 137 U.S. 147 [11 S.Ct. 54, 36 L.Ed. 636] (1890)—assumed that this was the law. Regardless of the correctness of the *Catlow* and *Russo* decisions of the Court of Military Appeals, I believe that this should be the law.