**UNITED STATES, Appellee,**

v.

**Private (E–1) Donald R. BOONE, SSN 336–58–2835, United States Army, Appellant.**

**CM 439435.**

U. S. Army Court of Military Review.

9 Feb. 1981.

Major Grifton E. Carden, JAGC, and Captain Dennis E. Brower, JAGC, were on the pleadings for appellant.

Colonel R. R. Boller, JAGC, Major Ted B. Borek, JAGC, Major Douglas P. Franklin, JAGC, and Captain Kenneth H. Clevenger, JAGC, were on the pleadings for appellee.

Before FULTON, CLAUSE and FORE-MAN, Appellate Military Judges.

## OPINION OF THE COURT

FULTON, Senior Judge:

On this, the second conviction of the appellant that we have reviewed during his enlistment, the appellant contends that courts-martial are without jurisdiction over him because his enlistment to avoid civilian charges was involuntary and was also void because it was accomplished with the fraudulent assistance of the recruiting sergeant. In addition, he contends that no constructive enlistment arose because he never thereafter voluntarily submitted to military authority.

We hold that appellant is subject to court-martial jurisdiction on each of two independent grounds. First his enlistment was neither involuntary nor, in view of the provisions of Article 2(b) of the Uniform Code of Military Justice, 10 U.S.C. § 802(b), as added by a recent amendment,[1] was it made void by the recruiter's fraud. Second, the appellant's conduct between his enlistment and the return to duty following his first conviction by a court-martial was such as to bring about a constructive enlistment, which the recruiter's misconduct does not estop the Government from asserting as a basis for jurisdiction.[2]

1. Sec. 801(a)(2), Department of Defense Authorization Act, 1980, Pub.L. 96–107, 93 Stat. 810, 10 U.S.C.A. § 802(b) (1980 Supp.), enacted 9 November 1979.

2. Article 2(c), Uniform Code of Military Justice, also added by sec. 801(a)(2), Department of Defense Authorization Act, 1980, *supra* note 1. For the legislative purpose in enacting Articles 2(b)–(c), see S.Rep. 96–197, 96th Cong., 1st Sess. 121–123 [hereinafter cited as Senate Report], *reprinted in* [1979] U.S.Code Cong. & Ad.News 1818, 1826–28; and Amendments to Articles 2 and 36, Uniform Code of Military Justice: Hearings Before the Military Personnel

## Procedural Background

On 15 November 1976, under circumstances described later in this opinion, appellant enlisted in the Regular Army for a three-year term of service. In April 1979, a special court-martial at Fort Stewart, Georgia, convicted him of striking a noncommissioned officer. The approved sentence included a short term of confinement and partial forfeiture of pay, and a bad-conduct discharge which the convening authority suspended when he took his action in June 1979. When the term of confinement had been served and the convening authority's action taken, appellant was permitted to go home on a combination of accrued and excess leave (*i. e.*, leave without pay) to await the completion of appellate review.

This court affirmed the conviction. *United States v. Boone*, SPCM 14054 (ACMR, 21 August 1979) (mem.). The conviction became final when appellant failed to petition the Court of Military Appeals for review. Since his punitive discharge remained suspended, he was ordered to report to Fort Knox, Kentucky, on 17 November 1979, to finish serving his enlistment. He returned to duty on that date, but then, on 5 December 1979, committed the offenses that have again brought him before this court, this time with an adjudged and approved sentence including a dishonorable discharge and confinement at hard labor for 18 months.[3] At this trial, unlike the earlier one, the jurisdictional issue stemming from appellant's recruiter-assisted fraudulent enlistment was raised and fully litigated. When his motion to dismiss the charges was denied, appellant entered a plea of guilty.

Subcomm. of the House Armed Services Comm., 96th Cong., 1st Sess. (1979) [hereinafter cited as House Hearings].

3. The offenses were conspiracy to commit robbery, robbery, and attempted robbery, in violation of Articles 80–81, 122, of the Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 880–881, 922 (1976). The records of this court do not disclose that the suspension of the previously adjudged bad-conduct discharge was vacated. We assume that it was remitted automatically on 21 January 1980, when the suspension period ended.

### Appellant's Enlistment and Service

About six weeks before the appellant enlisted, an Army recruiter contacted him, but appellant said that he did not wish to enlist.[4] A few weeks later, the recruiter called again. In the meantime, appellant had been arrested, charged with unlawful possession of marihuana and amphetamines and was soon to appear in the Court for the Third Municipal District of Cook County (Illinois). Learning this, the recruiter wanted to discuss enlistment as a means of getting the charges dropped.

According to appellant's older sister, with whom he was residing at the time, appellant was reluctant to consider the proposal, but agreed to discuss the matter and the recruiter came to the apartment for that purpose. The recruiter also telephoned appellant's mother (although we do not know exactly when in relation to the other events) to ascertain that she would consent to appellant's enlistment if the charges could be dropped.

Although the record includes no direct testimony as to the conversation with the recruiter at the sister's apartment or any other conversations with him, it is evident that some understanding was reached. When the appellant appeared in court on 12 November 1976, he was accompanied by his mother, his sister, and the recruiter. When the case was called, either the recruiter or a man whom appellant thought to be a public defender or appointed counsel asked to discuss the case with the judge and, together with the arresting officer, withdrew to the judge's chambers. The appellant and his mother moved to accompany them, but were asked to wait in the hall. After the day's remaining cases were called, the judge announced that appellant's case was "nolle prosequi for career opportunities."

There is no direct evidence as to the conversation in chambers. The parties to this case stipulated that the judge would testify that he no longer recalled appellant's case, but that, when a recruiter was present in court to say that he could enlist a defendant if charges were dropped, and the charges were not too serious, he customarily agreed and announced the entry of a nolle prosequi "for career opportunities." This, he would testify, was a term he alone used "as sort of a note for future reference should a question arise." The judge also, according to the stipulation, would testify that, "I would not have personally threatened the defendant with jail. Usually, the recruiter would have told me that the defendant is willing to go into the Army."

Nor has appellant contended that the judge or anyone else did threaten him with jail as an alternative to enlistment. Both the mother and sister recall the judge's words as being to the effect that appellant now "can" or "could" join the Army. We note appellant's testimony that the recruiter later told him not to "book" (apparently meaning not to run away) or he, *the recruiter*, would be in trouble. Moreover, we note the absence of any testimony that the recruiter told appellant that he would go to jail if he did not enlist. The main thrust of appellant's testimony was simply that he had not wanted to join the Army and did not fully understand what was happening in the courtroom.

Following the appearance in court, which was on Friday, the family adjourned to the sister's apartment, where appellant and the recruiter completed some of the enlistment papers and the recruiter witnessed the mother's consent (she was divorced from appellant's father) to her son's' enlistment (his 18th birthday would not occur for another month-and-a-half). On Monday, 15 November 1976, appellant presented himself at the recruiting station and was enlisted.

From his enlistment in November 1976 until he was incarcerated in April 1979 pur-

---

4. Apparently this was in September or early October 1976, during appellant's senior year in high school. This recruiter had visited appellant's school in the Spring of 1976, during appellant's junior year, during which he had reached age 17. At that time, appellant and a friend had proposed enlisting under a "buddy" plan, but appellant's mother persuaded him to stay in school instead.

suant to the special court-martial sentence, appellant performed duties and received benefits as a soldier. He successfully completed basic combat training at Fort Jackson, South Carolina, and advanced individual training at Fort Lee, Virginia, where he was schooled as a cook. In accordance with the option selected by him when enlisting, he was assigned to duty at Fort Stewart, Georgia. On one occasion, he performed duty at Fort Drum, New York, away from his unit. He once was absent without authority for a six-day period. He received nonjudicial punishment on two occasions, one of which was for possession of marihuana, but also received a Certificate of Achievement for his service at Fort Drum and some letters of commendation. He made no attempt to obtain a discharge, although he professed once to have considered seeking a discharge on grounds of drug or alcohol abuse. No question as to the validity of his enlistment was raised in the special court-martial proceedings.

When appellant, on leave awaiting completion of appellate review, learned that his bad-conduct discharge had been suspended and he was expected to report back to duty, he was disappointed, for he had acquired a job, a truck, an apartment, and furniture. Accordingly, he sought legal advice at nearby Fort Sheridan, Illinois. There, he learned that the circumstances of his enlistment might have provided a defense to his trial by special court-martial and might also afford a basis for him to be discharged as a fraudulent enlistee.

Appellant then petitioned the Court of Military Appeals for review of his special court-martial conviction, but the petition was dismissed as untimely filed. *United States v. Boone*, 8 M.J. 251 (C.M.A.1980). As for administrative discharge, a representative of the command issuing his orders to report to Fort Knox said that it was then too late to delay the reporting date and that he should pursue the matter at Fort Knox. He did so, but was told by his First Sergeant that his normal discharge date (2 February 1980 when adjusted pursuant to 10 U.S.C. § 972(2), (4) (1976)) would probably occur before investigation and process-

ing for discharge as a fraudulent enlistee could be completed. For that reason, appellant took no further action with a view to obtaining a discharge.

Eighteen days after his arrival at Fort Knox, appellant conspired with two other members of the permanent party to rob some trainees, thereby setting in motion a course of events that led to his pretrial confinement that day. There is evidence that he had received a travel allowance and a partial pay, but no other payments were made until the first and subsequent paydays after his incarceration.

*Regulatory and Statutory Requirements*

When appellant enlisted, the governing regulations provided that, among those ineligible to enlist were—

> Persons who, as an alternative to further prosecution, indictment, trial or incarceration in connection with the charges, or to further proceedings relating to adjudication as a youthful offender or juvenile delinquent, are granted a release from the charges at any stage of the court proceedings on the condition that they will apply for or be accepted for enlistment in an Armed Force.

Army Regulation 601–210, Personnel Procurement: Regular Army Enlistment Program (edition of 15 January 1975), appendix A, line K and note at p. A–2 (page dated 28 July 1976). The disqualification was non-waivable. *Id.* The regulation also provided that—

> Recruiting personnel will not participate directly or indirectly in the release of an individual from a pending charge in order that he may enlist in the Army as an alternative to further prosecution or further juvenile court proceedings. Equally important, recruiting personnel will in no way contribute, either tacitly or expressly, to the false notion that the Army condones such a practice....

Army Regulation 601–210, *supra*, par. 3–13*d* at p. 3–9 (page dated 28 July 1976).

The appellant's application for enlistment—introduced by the defense as an ap-

pellate exhibit in support of its motion to dismiss the charges—shows correctly that appellant had been arrested, jailed while awaiting bond, and the charges "nolle prossed." The question whether appellant had been relieved of charges on condition that he apply for or enlist in the armed forces was answered in the negative. The appellant testified that the recruiter had him answer falsely "no" to questions whether he had ever taken drugs except as medically prescribed and whether he had ever intentionally sniffed glue or other inhalants.[5]

Article 2(b), Uniform Code of Military Justice, *supra* note 1, provides as follows:

The voluntary enlistment of any person who has the capacity to understand the significance of enlisting in the armed forces shall be valid for purposes of jurisdiction under ... [the UCMJ] and a change of status from civilian to member of the armed forces shall be effective upon the taking of the oath of enlistment.

Article 2(c), Uniform Code of Military Justice, *supra* note 2, provides as follows:

Notwithstanding any other provision of law, a person serving with an armed force who—

(1) submitted voluntarily to military authority;

(2) met the mental competency and minimum age qualifications ... [prescribed by 10 U.S.C. §§ 504–505 (1976)] at the time of voluntary submission to military authority;

(3) received military pay and allowances; and

(4) performed military duties; is subject to ... [the UCMJ] until such person's active service has been terminated

in accordance with law or regulations promulgated by the Secretary concerned.

The appellant contends that his motion to dismiss the charges should have been granted because his was a forced enlistment and therefore was not subject to court-martial jurisdiction. *United States v. Catlow,* 23 U.S.C.M.A. 142, 48 C.M.R. 758 (1974). He further contends that, even if his enlistment had been voluntary, it was nonetheless void as a basis for court-martial jurisdiction because the recruiter enlisted him despite knowing that he possessed a disqualification that was not waivable. *See United States v. Stone,* 8 M.J. 140 (CMA 1979).[6] He also asserts that no constructive enlistment could arise because, under the applicable state law, the charges against him remained subject to prosecution until the statute of limitations had run, so that his continued military service was no more voluntary than his enlistment.

*Voluntariness of Appellant's Enlistment*

■ When a civilian court uses its sentencing power—"carrot-and-stick" fashion—to compel a defendant to choose between the certainty of going to jail and enlisting in the Army, a resulting enlistment is involuntary and affords no basis for the exercise of military jurisdiction. *United States v. Catlow,* 23 U.S.C.M.A. 142, 145, 48 C.M.R. 758, 761 (1974). However, the mere fact that an enlistee joins the Army only reluctantly and because he prefers not to risk going to jail does not render the enlistment involuntary. *United States v. Wagner,* 5 M.J. 461, 464 (C.M.A.1978) (enlistee "really did not wish to join the Army but ... did not want to risk going to jail either"). Therefore, if the enlistment alter-

---

**5.** Testifying at appellant's trial, the by now former recruiter freely admitted that he had engaged in various prohibited activities in order to meet enlistment quotas. Although he no longer recalled the appellant or his enlistment (despite some indication that he had dated appellant's sister), he testified that the enlistment could have come about exactly as depicted by the defense witnesses.

**6.** Besides the disqualification mentioned earlier (conditional dropping of charges to enlist), ap-

pellant contends that, when he reported for enlistment on Monday morning, he was still intoxicated from a farewell party of the previous night. We are not persuaded by his testimony or any other evidence in the record that he was intoxicated so as to be disqualified from enlistment within the meaning of Army Regulation 601–210, *supra* appendix A, line A, page A–1, much less that his capacity to complete *the enlistment process was affected.*

native originates with the defendant or those properly acting for him, its acceptance by the court does not alone impart coercion to the enlistment. *United States v. Wagner, supra; United States v. Lightfoot,* 4 M.J. 262, 263 (C.M.A.1978). Nor do we think the involvement of a recruiter normally could be regarded as coercive unless he were in a position to assure that the defendant would go to or remain in jail. Cf. *United States v. Barrett,* 1 M.J. 74 (C.M.A.1975) (enlistee already sentenced and in detention center when contacted by recruiter).

■ To rule as he did, the military judge necessarily found that appellant's enlistment was voluntary. We agree with that conclusion. The appellant's contention that he was coerced into enlisting is unconvincing. Unlike the situation in *Catlow,* no threat or promise of jail emanated from the judge or prosecutor. Instead, the enlistment proposal was advanced on appellant's behalf with the concurrence of the parent having legal custody over him and with his own concurrence tacit if not express. The recruiter's involvement, while apparently persuasive, did not come at a time when jail was a certain alternative, nor did anyone testify that the recruiter depicted a jail sentence as an alternative to enlistment. So far as appears, such persuasiveness as was practiced upon the appellant came equally from his family and he, like Private Wagner, merely preferred Army service to the risk of going to jail. *United States v. Wagner, supra,* 5 M.J. at 464. That being the case, his enlistment, if reluctant, was nevertheless not involuntary in the legal sense.

■ Nor is appellant's enlistment void due to the fraudulent conduct of his recruiter.[7] Article 2(b) of the Uniform Code of Military Justice, *supra* note 1, eliminates recruiter concealment of an enlistee's disqualification as a factor in determining the validity of enlistments. Senate Report, *supra* note 2, at 122; House Hearings, *supra* note 2, at 3 *passim.* While Article 2(b) was not enacted until after appellant had enlisted, we, in accordance with the obvious Congressional purpose and consistent with the wording of the Article, have held that it applies retroactively to persons already serving, as was appellant, on the date of its enactment. *United States v. McDonagh,* 10 M.J. 698, 703–706 (A.C.M.R.1981).

■ We hold, therefore, that the appellant's enlistment on 15 November 1976 was voluntary and, there being no question as to his capacity to understand the significance of enlisting, that his status changed from civilian to member of the Army upon the taking of the oath of enlistment. The motion to dismiss the charges for lack of in personam jurisdiction was properly denied.

*Enlistment Constructively If Not Otherwise*

Even if we were to assume that appellant's enlistment was void, during the ensuing 29 months he entered into a constructive enlistment satisfying the four-part test set forth in Article 2(c) of the Uniform Code of Military Justice, *supra* note 2.

■ Meeting Article 2(c)'s first requirement, which is that the person "submitted voluntarily to military authority," is not prevented by any involuntariness of the initial contract. *See, e. g.,* House Hearings, *supra* note 2, at 20 (statement of Maj. Gen. Wilton B. Persons, Jr.) ("[w]hile this pending legislation will not affect the *Catlow* situation, it will allow an individual to later submit voluntarily to military service and thus to effect a constructive enlistment"); *accord, id.* at 27 (statement of Rear Adm. Charles E. McDowell). Nor do we perceive

---

7. We will assume, although we have no direct information as to what took place in the judge's chambers, that the decision not to further prosecute the charges was "on condition that ... [he] apply for or be accepted for enlistment" within the intendment of Army Regulation 601–210, *supra.*

in the wording or intent of the statute a requirement that the impediment to the initial enlistment, except for a failure to meet the mental competency and minimum age qualifications prescribed by statute, be removed before a constructive enlistment may arise.[8]

■ Insofar as the fraudulent conduct of a recruiter has heretofore been held to preclude a constructive enlistment from being asserted by the government as a basis for jurisdiction, we regard Article 2(c) as retroactively applicable so as to enable a constructive enlistment to arise from conditions occurring during a purported enlistment before Article 2(c) was enacted.[9]

■ For a period of more than two years, the appellant performed military service without protest, even when faced with disciplinary action. Throughout service at three separate installations, he made no attempt to terminate his service. He was promoted at regular intervals, eventually to the grade of Specialist Four. For at least two months in the summer of 1978, he served away from his unit at Fort Drum, New York. His records disclose that he was absent without authority for a 6-day period in September 1977, but do not indicate the reason or that disciplinary action

resulted. Besides being caught with marihuana, his only other infractions involved disrespect to a noncommissioned officer and, as indicated by his previous court-martial, striking a noncommissioned officer. The same sergeant was the victim in both instances, and appellant's testimony indicates that these resulted from a personal dislike of the sergeant and were not a protest against continued service. As previously mentioned, more than once the quality of his performance merited commendation. There is not the slightest indication that appellant believed that he could be prosecuted on the original charges if he left the Army.

Accordingly, we hold that appellant submitted voluntarily to military authority. There is no question that appellant met statutory requirements as to age and competence, and that he met the remaining tests of Article 2(c) by performing military duties and accepting military pay and allowances.

We note that, in view of appellant's actions connected with his return to duty in November 1979, his performance of duty and receipt of pay and allowances may not have been sufficient to give rise to a constructive enlistment. It was by then too late, however. His service before April

---

8. The notion that the original impediment to a valid enlistment must be removed or overcome for a constructive enlistment subsequently to arise is peculiarly applicable when matters affecting capacity, such as nonage, are involved. *See, e. g., United States v. Graham,* 22 U.S.C. M.A. 75, 46 C.M.R. 75 (1972). This court, followed by the Court of Military Appeals, seems unanalytically to have extended the requirement to disqualifications having nothing to do with capacity and which, if technically non-waivable, could at least be removed by changing departmental regulations. *See United States v. Catlow,* 47 C.M.R. 617, 619 (A.C.M.R. 1973) (headnote 2), *and United States v. Wagner,* 5 M.J. 461, 465 n.3 (C.M.A.1978). That, in turn, has led to speculation, and perhaps some erroneous conclusions, whether the disqualification here involved (discontinuance of prosecution in consideration of enlistment) can, in view of its terms, ever be removed. *See United States v. Catlow,* 23 U.S.C.M.A. 142, 145–46, 48 C.M.R. 758, 761–62 (1974); *United States v.*

*Wagner,* 3 M.J. 898, 901 n.6 (A.C.M.R.1977), *aff'd,* 5 M.J. 461 (C.M.A.1978). Under our interpretation of the new Article 2(c), this speculation may now be ended.

9. In *United States v. McDonagh,* 10 M.J. 698, 705, 708–709 (A.C.M.R.1981), I alluded to testimony of The Judge Advocate General of the Navy which could be construed as indicating his belief that Article 2(c) would not be retroactive. I am not convinced that such was his intent, and in any event, the same factors that have convinced us that Article 2(b) is to be applied with retroactive effect suggest that Article 2(c) is to be similarly applied. *United States v. McDonagh, supra,* at 703–706. Whether the prohibition of ex post facto criminal legislation applies is not involved in this case since appellant's offenses were not committed until after the legislation had been enacted on 9 November 1979.

1979 constituted a constructive enlistment. Therefore, to paraphrase Article 2(c), military status and military jurisdiction remain intact until his active service has been terminated in accordance with law or regulations.

The remaining assigned error was resolved in a manner adverse to appellant in *United States v. Mack*, 9 M.J. 300 (C.M.A. 1980).

The findings of guilty and the sentence are affirmed.

Judge CLAUSE and Judge FOREMAN, concur.