UNITED STATES, Appellee,

v.

John R. BENNETT, Jr., Sergeant, U. S. Air Force, Appellant.

Dkt. No. 39,914.
ACM 22664/G.

Court of Military Appeals.

April 19, 1982.

For Appellant: *Captain Richard A. Morgan* (argued); *Colonel George R. Stevens, Major Wade B. Morrison* (on brief); *Colonel Larry G. Stephens.*

For Appellee: Captain Michael J. Hoover (argued); Colonel James P. Porter (on brief); Major Robert T. Mounts.

Amicus Curiae on behalf of the United States Army: Captain Gary L. Hoffman (argued); Colonel R. R. Boller, Major Robert B. Williams (on brief).

## OPINION OF THE COURT

COOK, Judge:

In this case we are confronted with the issue of the witness located in the United States who is unwilling to travel overseas to testify at a court-martial.

The accused was tried by a general court-martial convened in the Republic of the Philippines, for conspiracy to commit larceny, larceny and burglary, in violation of Articles 81, 121 and 129, Uniform Code of Military Justice, 10 U.S.C. §§ 881, 921 and 929, respectively. Convicted despite his pleas, he was sentenced to a bad-conduct discharge, confinement at hard labor for 1 year, forfeiture of all pay and allowances, and reduction to the grade of E–1.[1]

At an Article 39(a), UCMJ, 10 U.S.C. § 839(a), session held several weeks prior to trial on the merits, the accused requested the attendance of a William J. Reddick, formerly a sergeant in the Security Police Unit at Clark Air Base, Republic of the Philippines. Some eight days previously, defense counsel had requested the presence of Reddick[2] by letter to the trial counsel, but had been turned down by the convening authority upon recommendation of the trial counsel that Reddick's testimony would be cumulative of testimony of other witnesses who would be available at trial.[3] Renewing his request to the military judge, defense counsel offered five reasons why Reddick's presence was necessary:

1. He would controvert the expected testimony of the victim that the accused was "nervous, upset, shaking";

2. He would controvert the expected testimony of the victim and an Airman Berry that the accused gave the keys to the "getaway car" to Berry;

3. He would "testify that, when he arrived on the scene," the victim told him "two people" participated in the burglary and that he did not mention the accused;

4. He would testify that the victim "was ... very upset, very mad, and remained so for approximately twenty minutes"; and,

5. He would testify that he "took a statement from Airman Berry on the night in question in which ... Berry" stated "that he gave ... [his car] keys originally to ... [Airman] Douse [and] not to" the accused.

In essence, said defense counsel, Reddick was "the only person" on the scene who would offer evidence as to the actions of the prosecution witnesses which were inconsistent with what their anticipated testimony would be. In response, trial counsel argued that Reddick would only testify as to inconsistencies in the pretrial statements given by the victim and Berry, and as to the demeanor of the victim at the time, all of which evidence would be available through other witnesses or from other sources, and trial counsel averred that the prior inconsistent written statements were available to impeach the witnesses. The military judge ruled that, based on the information contained in defense counsel's request for Reddick submitted to the trial counsel and the arguments of counsel, "Sergeant Reddick's

---

1. By action dated July 23, 1980, the successor convening authority suspended the bad-conduct discharge, the confinement and the forfeitures remaining after July 16, 1980, until January 17, 1981, with provision for automatic remission.

2. On August 29, 1979, defense counsel informed the convening authority of Sergeant Reddick's impending separation and return to the United States, and the possibility of Red-

dick's refusal to return as a witness. Defense counsel asserted his request for Reddick and requested a deposition be taken. This entire matter might have been avoided had the convening authority acceded to this entirely reasonable request.

3. One other witness located in the United States, but still a member of the Air Force, was requested and she did appear at trial.

testimony would be material to this case"[4] and "direct[ed] the government to locate and bring Sergeant Reddick back for the trial."

When the trial reconvened, trial counsel submitted a message stating that Reddick, after first agreeing to come, had changed his mind because travel to the Philippines would cause personal problems. Defense counsel argued that since the Government could not force Reddick to travel, there must be a change of venue of the trial or the proceedings must be abated. Trial counsel again argued that Reddick's testimony was not essential to a fair trial.

The military judge then ruled:

This court has found that the testimony of Sergeant Reddick is material, however, it appears that the government has expended all reasonable efforts to secure his attendance at trial and that this is purely Sergeant Reddick's personal position that he is refusing to attend. Therefore, the motion for a change of venue is denied. The motion to dismiss the charges because Sergeant Reddick has refused to attend is also denied.

Defense counsel then offered to participate in preparing a stipulation of Reddick's expected testimony based upon testimony he had given in prior courts-martial and pretrial investigations. This was later done and was read to the members during the defense case-in-chief.

We granted (10 M.J. 251 (C.M.A.)) appellant's issue:

WHETHER THE MILITARY JUDGE ERRED BY REFUSING TO GRANT A CHANGE OF VENUE, WHICH RESULTED IN A DENIAL OF THE APPELLANT'S SIXTH AMENDMENT RIGHT TO COMPULSORY PROCESS FOR OBTAINING WITNESSES IN HIS FAVOR.

We specified this issue:

WHETHER A UNITED STATES CITIZEN LOCATED IN THE UNITED STATES MAY BE SUBPOENAED TO TESTIFY AT A COURT-MARTIAL HELD OUTSIDE THE UNITED STATES.

## I

In order to set the relative importance of Reddick's testimony in proper context, the somewhat confusing facts surrounding the offenses must be understood. The victim, returning to his barracks with his girl friend at about 10:00 p. m., saw three people carrying stereo equipment out of the barracks and placing it in a car located near the building. Upon coming closer, he recognized the stereo equipment as his own, which had been secured in his room when he left in the afternoon. He also identified two of the people as Airman Douse, his former roommate, and Airman Strong, but he did not immediately identify the accused. As he ran toward the car, the three put the equipment down and fled. After an unsuccessful chase, the victim returned to the barracks and called the Security Police. He saw the accused approaching the car and ran to it, secured the keys from the ignition and went to the trunk to open it. A brief scuffle between the accused and the victim ensued, after which the accused took the keys and opened the trunk. Inside were several pieces of the victim's stereo equipment. According to the victim, the accused begged him not to implicate him since he was returning to the United States soon. The accused and the victim then carried the equipment back into the barracks.

Sergeant Reddick arrived on the scene as a Security Police investigator. The victim made an oral statement to Sergeant Red-

---

4. The word "material" appears misused. Obviously a witness' testimony must be material to be admissible. *See* para. 137, Manual for Courts-Martial, United States, 1969 (Revised edition), where "material evidence" is given the same meaning as "relevant evidence." *Cf.* Mil. R.Evid. 401. However the terms may have been confused in earlier cases, the true test is essentiality. If a witness is essential for the presentation of the prosecution's case, he will be present or the case will fail. The defense has a similar right. Article 46, Uniform Code of Military Justice, 10 U.S.C. § 846; *United States v. Daniels*, 23 U.S.C.M.A. 94, 48 C.M.R. 655 (1974).

dick which made no mention of the accused. The victim later repudiated this statement and made another implicating the accused. Another witness, Berry, who owned the car used in the theft, but who did not otherwise participate, also made a false statement to Reddick, at the behest of the accused, that he had given the car keys to Airman Douse rather than to the accused. Berry later repudiated his statement at a subsequent Article 32, 10 U.S.C. § 832, investigation concerning Airman Douse. At trial, the defense attacked the credibility of the victim and Berry, mainly by using their prior inconsistent statements.

Hence, appellate defense counsel argue that Reddick's testimony as to their demeanor and statements at the crime scene could have affected the court members' evaluation of the credibility of their trial testimony.

Examining the record, we are convinced that Reddick, while relevant to the credibility of two of the government witnesses, was not essential to the presentation of the accused's defense.[5] Looking specifically to the five assertions made by defense counsel, the record shows that: The victim did not testify that the accused was "nervous, upset, shaking"; the victim did not testify as to how Airman Berry received the car keys—because no one asked him; the victim admitted on the stand that he told Reddick that he saw two people running away instead of three and admitted that he did not implicate the accused until later; the victim testified that he "was upset and . . . scared" and Berry testified that the victim was "mad and excited"; and, finally, Berry admitted both his false statement at the scene and his subsequent implication of the accused.

Thus, with the entire record of trial before us, it is evident that the pretrial averments of trial counsel became true.

■ The ruling of the military judge on the defense motion for a change of venue is on "an interlocutory matter," and "is final and constitutes the ruling of the court." Article 51(b), UCMJ, 10 U.S.C. § 851(b). In making such a decision, the military judge must consider "the convenience of the parties and witnesses and . . . the inconvenience to the Government." *United States v. Nivens*, 21 U.S.C.M.A. 420, 422–23, 45 C.M.R. 194, 196–97 (1972). Here, the military judge acknowledged his awareness of these conflicting interests in making his decision. Under the circumstances of this case as enumerated above, we find no abuse of discretion which would justify our overturning his ruling. *See United States v. Knudson*, 4 U.S.C.M.A. 587, 16 C.M.R. 161 (1954); *United States v. Plummer*, 1 U.S.C.M.A. 373, 3 C.M.R. 107 (1952).

## II

■ This Court has long held that the accused shall have equal opportunity with the Government to secure the attendance of witnesses at his trial, and he cannot be forced to present the testimony of material witnesses on his behalf by way of stipulation or deposition. *United States v. Sweeney*, 14 U.S.C.M.A. 599, 34 C.M.R. 379 (1964); *United States v. Thornton*, 8 U.S.C.M.A. 446, 24 C.M.R. 256 (1957). However, an accused's right is not absolute in this regard. *United States v. Sweeney, supra.* As we have held:

The Court has never fashioned an inelastic rule to determine whether an accused is entitled to the personal attendance of a witness. It has, however, identified some relevant factors, such as: the issues involved in the case and the importance of the requested witness as to those issues; whether the witness is desired on the merits or the sentencing portion of the trial; whether the witness' testimony would be merely cumulative; and the availability of alternatives to the personal appearance of the witness, such as deposition, interrogatories or previous testimony. The foregoing is not meant to be exhaustive, nor can any one factor be identified as necessarily determinative of the issue. Rather, the matter must be

5. *See* n. 4, *supra.*

left to the sound discretion of the person ruling on the request for the personal attendance of a witness. If adverse to the accused, the ruling is subject to review and reversal if there has been an abuse of discretion.

*United States v. Tangpuz*, 5 M.J. 426, 429 (C.M.A.1978) (footnote omitted).

■ Obviously, one factor which must enter into the decision, of the person ruling on the request for a witness is the unavailability of the witness, such as that occasioned by nonamenability to the court's process. In that event, other methods of securing the witness' testimony must be pursued. *See* Article 49, UCMJ, 10 U.S.C. § 849. These would include depositions, written interrogatories, stipulations of testimony, and, in the event of an essential witness, changes of venue. *See generally United States v. Tangpuz, supra; United States v. Nivens, supra; United States v. Hodge*, 20 U.S.C.M.A. 412, 43 C.M.R. 252 (1971); *United States v. Manos*, 17 U.S.C.M.A. 10, 37 C.M.R. 274 (1967); *United States v. Jacoby*, 11 U.S.C.M.A. 428, 29 C.M.R. 244 (1960). In the many cases of this Court concerning the essentiality of the appearance of witnesses before courts-martial, we have usually been faced with the issue of the prejudicial effect of the refusal of the authorizing authorities to compel attendance. *See United States v. Roberts*, 10 M.J. 308 (C.M.A.1981); *United States v. Williams*, 3 M.J. 239 (C.M.A.1977); *United States v. Willis*, 3 M.J. 94 (C.M.A.1977); *United States v. Carpenter*, 1 M.J. 384 (C.M.A.1976). Here, however, we have a finding by the military judge that "the government has expended all reasonable efforts to secure . . . [the witness'] attendance." We must examine this finding in light of our specified issue.[6]

The power of courts-martial to subpoena nonmilitary witnesses was first addressed in this Country in 1779. Resolution of November 16, 1779, 15 Journals of the Continental Congress 1272, 1277–78 (1909). However,

the power was first stated in its modern form in 1863:

That every judge advocate of a court-martial or court of inquiry hereafter to be constituted, shall have power to issue the like process to compel witnesses to appear and testify which courts of criminal jurisdiction within the state, territory, or district where such military courts shall be ordered to sit may lawfully issue.

Act of March 3, 1863, sec. 25, 12 Stat. 754 (1863). Passing thereafter through various forms, the present subpoena power for courts-martial appears in Article 46, UCMJ, 10 U.S.C. § 846:

The trial counsel, the defense counsel, and the court-martial shall have equal opportunity to obtain witnesses and other evidence in accordance with such regulations as the President may prescribe. Process issued in court-martial cases to compel witnesses to appear and testify and to compel the production of other evidence shall be similar to that which courts of the United States having criminal jurisdiction may lawfully issue and shall run to any part of the United States, or the Territories, Commonwealths, and possessions.[7]

In foreign territories, the attendance of civilian witnesses may be obtained in accordance with existing agreements, or absent such agreements, in accordance with general principles of international law. Para. 115 *d*(1), Manual for Courts-Martial, United States, 1969 (Revised edition).

This Court has grappled with the problems of compelling the attendance of witnesses at courts-martial convened outside of the United States, its Territories, Commonwealths and possessions. In *United States v. Stringer*, 5 U.S.C.M.A. 122, 17 C.M.R. 122 (1954), we held that a French national was not amenable to American process issued by a court-martial sitting in France. This was followed by *United States v. Burrow*, 16 U.S.C.M.A. 94, 36 C.M.R. 250 (1966), where

---

6. We compliment the Army appellate government counsel for their informative and definitive *amicus curiae* brief.

7. The provision for enforcement and the penalty for noncompliance is set forth in Article 47, UCMJ, 10 U.S.C. § 847.

the written transcript of the testimony of two French witnesses at an Article 32 hearing was admitted since they "were ... admittedly not amenable to subpoena by United States authorities." *Id.* at 97, 36 C.M.R. at 253. Then, in *United States v. Hodge, supra,* in deciding whether the conditions for admitting a deposition were met, Chief Judge Quinn assumed, without deciding,

> that a witness physically in the United States may be subpoenaed to attend and testify at a court-martial convened in a foreign country.... [T]hat attending a trial in a combat zone presents such grave danger to a civilian witness that we can properly compare his situation to one who, because of illness or disease, would be in grave danger if compelled to attend and testify, ... [and] that regardless of the language of Article 49 a witness' unwillingness to testify is not tantamount to his unavailability.

*Id.* at 413, 43 C.M.R. at 253. Finally, in *United States v. Daniels,* 23 U.S.C.M.A. 94, 48 C.M.R. 655 (1974), we faced the issue squarely. There the accused was charged with attempted carnal knowledge of a minor and requested the victim, a military dependent residing in Belgium, as a witness before the court-martial convened in Belgium. The Government asserted that it had endeavored to secure her presence, but could not produce her because the Government had no subpoena power over a civilian dependent residing in Europe. Senior Judge Ferguson held:

> Neither Article 46, UCMJ, 10 U.S.C. § 846, nor paragraph 115*d,* MCM, explicitly authorized the court-martial to compel the testimony of Miss H. under the circumstances.... In the absence of specific statutory or regulatory authority to compel Miss H.'s testimony as a defense witness, and so long as her volun-

tary presence could not be secured, we believe the military judge had no constitutional alternative except to abate the proceedings.

*Id.* at 96, 48 C.M.R. at 657. Concurring in the result, Judge Quinn wrote:

> Section 1783(a), Title 28 of the United States Code, empowers a "court of the United States" to issue a subpoena to a citizen of the United States resident in a foreign country requiring appearance as a witness before the court or "a person or body designated by it : ... [if] necessary in the interest of justice." The statutory definition of "court of the United States" excludes a court-martial, but it includes a United States District Court.... The grant of authority to compel testimony before any "person or body" is, in my opinion, sufficiently broad to include the power to require testimony before a court-martial. While the procedure is cumbersome, it is a means by which the requested witness in this case could have been required to appear before the court-martial trying the accused. Consequently, it was error for the trial judge to allow the case to proceed without requiring the Government to resort to § 1783(a) to compel attendance of the witness.

*Id.* at 97, 48 C.M.R. at 658.[8]

In general, the process of a court is limited to the territorial jurisdiction of the court. *Ahrens v. Clark,* 335 U.S. 188, 68 S.Ct. 1443, 92 L.Ed. 1898 (1948); *Pennoyer v. Neff,* 95 U.S. 714, 24 L.Ed. 565 (1878). And, *in personam* jurisdiction may not extend beyond that jurisdiction. *Hess v. Pawloski,* 274 U.S. 352, 355, 47 S.Ct. 632, 633, 71 L.Ed. 1091 (1927). An exception to this general rule is found in 28 U.S.C. § 1783(a), which provides:

8. This case was cited by the Army Court of Military Review in *United States v. Boone,* 49 C.M.R. 709, 10 M.J. 715 (A.C.M.R.1975), as authority for the proposition that a court-martial has no power to subpoena a witness in the United States to appear at a court-martial in a foreign country. We have held that *United States v. Daniels, supra,* "does not justify ...

[such a] conclusion," and reserved resolution of that issue for a later date. *United States v. Roberts,* 10 M.J. 308, 314 n. 7 (C.M.A.1981). The Air Force Court of Military Review followed the decision of *United States v. Boone, supra.* See *United States v. Tippit,* 7 M.J. 908 (A.F.C.M.R.1979).

A court of the United States may order the issuance of a subpoena requiring the appearance as a witness before it, or before a person or body designated by it, of a national or resident of the United States who is in a foreign country, or requiring the production of a specified document or other thing by him, if the court finds that particular testimony or the production of the document or other thing by him is necessary in the interest of justice, and, in other than a criminal action or proceeding, if the court finds, in addition, that it is not possible to obtain his testimony in admissible form without his personal appearance or to obtain the production of the document or other thing in any other manner.

This rather striking departure from precedent was held constitutional in *Blackmer v. United States,* 284 U.S. 421, 52 S.Ct. 252, 76 L.Ed. 375 (1932). While the power granted by Congress there is the exact obverse to that considered here, the discussion of the Supreme Court sustaining it merits our consideration.

Blackmer "removed his residence to France in . . . 1924," but retained his United States citizenship. *Id.* at 436, 52 S.Ct. at 254. Subpoenas were served upon him in France in the manner prescribed by the statute, but petitioner refused to honor them. Proceedings for contempt against petitioner resulted in "a fine of $30,000 . . . in each case, to be satisfied out of the property of the petitioner which had been seized by . . . the court." [9] *Id.* at 433, 52 S.Ct. at 253. On appeal to the Supreme Court, petitioner contended that the statute violated the Fifth Amendment to the United States Constitution in that, among other things, "the act . . . [did] not provide 'a valid method of acquiring judicial jurisdiction to render personal judgment against defendant and . . . his property.'" *Id.* at

436, 52 S.Ct. at 254. In rejecting his arguments, the Supreme Court held:

By virtue of the obligations of citizenship, the United States retained its authority over him, and he was bound by its laws made applicable to him in a foreign country. Thus, although resident abroad, the petitioner remained subject to the taxing power of the United States. . . . While the legislation of the Congress, unless the contrary intent appears, is construed to apply only within the territorial jurisdiction of the United States, the question of its application, so far as citizens of the United States in foreign countries are concerned, is one of construction, not of legislative power. . . . Nor can it be doubted that the United States possesses the power inherent in sovereignty to require the return to this country of a citizen, resident elsewhere, whenever the public interest requires it, and to penalize him in case of refusal. . . . It is also beyond controversy that one of the duties which the citizen owes to his government is to support the administration of justice by attending its courts and giving his testimony whenever he is properly summoned. . . .

In the present instance, the question concerns only the method of enforcing the obligation. The jurisdiction of the United States over its absent citizen, so far as the binding effect of its legislation is concerned, is a jurisdiction in personam, as he is personally bound to take notice of the laws that are applicable to him and to obey them. . . . The question of the validity of the provision for actual service of the subpoena in a foreign country is one that arises solely between the Government of the United States and the citizen. The mere giving of such a notice to the citizen in the foreign country of

**9.** The method of enforcing compliance with the subpoena is now found in 28 U.S.C. § 1784(b), which states:

The court, in the order to show cause, may direct that any of the person's property within the United States be levied upon or seized, in the manner provided by law or court rules governing levy or seizure under execution,

and held to satisfy any judgment that may be rendered against him pursuant to subsection (d) of this section if adequate security, in such amount as the court may direct in the order, be given for any damage that he might suffer should he not be found in contempt. Security under this subsection may not be required of the United States.

the requirement of his government that he shall return is in no sense an invasion of any right of the foreign government and the citizen has no standing to invoke any such supposed right. . . .

As the Congress could define the obligation, it could prescribe a penalty to enforce it. And, as the default lay in disobedience to an authorized direction of the court, it constituted a contempt of court, and the Congress could provide for procedure appropriate in contempt cases.

284 U.S. at 436–40, 52 S.Ct. at 254–255 (footnote omitted).

We think the significant words above are these, and we repeat them:

[T]he legislation of the Congress, unless the contrary intent appears, is construed to apply only within the territorial jurisdiction of the United States.

*Id.* at 437, 52 S.Ct. at 254. Hence, we must look first to our enabling statute to find any indication that Congress intended the military subpoena power to apply other than "to any part of the United States, or the Territories, Commonwealths, and possessions." Article 46, *supra.* The legislative history of the Uniform Code of Military Justice offers little assistance.

Mr. Gavin. Supposing that in an emergency some of the witnesses were in other parts of the world other than the United States, its Territories, and possessions, how would you bring those witnesses back to testify in a trial that may be held here in the United States?

Mr. Larkin. Well, you would bring them back if you could under any circumstances, but if it were physically impossible you just could not do it. If it turns out that they are most material to the issue or that they are the only witnesses to the case, why, you just could not try the case without them.

Mr. Elston. If you could not bring them back, you could certainly take their depositions.

Mr. Larkin. That is possible.

Mr. Brooks. And the defendant would have the same opportunity that the prosecution has?

Mr. Larkin. That is the way we have tried to spell it out in here, yes, sir.

*Uniform Code of Military Justice* : Hearings on H.R. 2498 Before a Subcommittee of the House Committee on Armed Services, 81st Cong., 1st Sess. 1057 (1949) (hereafter cited as Legislative History).

In spite of the compelling argument of counsel, we are hesitant to imply a power so great as that sought here without specific authority from Congress. While the applicability of § 1783(a) to courts-martial need not be decided here, we do not consider it applicable to the present factual situation. Although the process of the court-martial would run to a citizen of the United States situated therein and, upon appearance before a Federal district court for enforcement of the subpoena, that court would have *in personam* jurisdiction over him, we doubt that such power would be sufficient to send the citizen beyond the jurisdiction of the Federal court, particularly to do acts in a foreign country. There is a significant distinction between prescriptive jurisdiction and enforcement jurisdiction. The former "signifies . . . [the] authority [of a government] to enact laws governing the conduct, relations, status or interests of persons or things, whether by legislation, executive act or order, or administrative rule or regulation"; the latter signifies a government's "authority to compel compliance or impose sanctions for noncompliance with its administrative or judicial orders." *F. T. C. v. Compagnie de Saint-Gobain-Pont-A-Mousson*, 636 F.2d 1300, 1315 (D.C.Cir.1980) (footnote omitted), *citing* Restatement (Second) of Foreign Relations Law of the United States §§ 6–7 (1965). Convening a court-martial in a foreign country constitutes an exercise of extraterritorial jurisdiction by the United States. *See* Article 5, UCMJ, 10 U.S.C. § 805; Legislative History at 897. A court-martial in enforcing the Uniform Code against servicemembers is exercising the prescriptive jurisdiction of the United States whether it involves conduct within or without the territory of the United States. But,

[w]hen an American court orders enforcement of a subpoena requiring the production of documents [or witnesses] and threatens penalties for noncompliance with that subpoena, it invokes the *enforcement jurisdiction*, rather than the prescriptive jurisdiction, of the United States.

*F. T. C. v. Compagnie de Saint-Gobain-Pont-A-Mousson, supra* at 1316 (footnote omitted). "[U]nlike ... prescriptive jurisdiction, ... enforcement jurisdiction by and large continues to be strictly territorial." *Ibid.* (footnote omitted). A court can enforce a subpoena within its territorial limits, but it could not exert its power to force the recalcitrant witness to travel beyond those territorial limits.[10]

An elementary principle of jurisdiction is that the processes of the courts of any sovereign cannot cross international boundary lines and be enforced in a foreign country.

*Ings v. Ferguson*, 282 F.2d 149, 151 (2nd Cir. 1960). Thus service of a subpoena *duces tecum* upon the New York agency of a Canadian bank requiring production of records located in Canada could not be enforced. *Ibid. See also*, Annotation, 82 A.L.R.2d 1403 (1962). We must conclude, therefore, that while a court's order to a resident citizen to travel to some place within the territorial limits of the United States, even to overseas territories under the jurisdiction of the United States is enforceable, its order to travel to a foreign country would shed its vitality at the shore and become a nullity. *Cf. United States v. Leal*, 460 F.2d 385 (9th Cir. 1972), *cert. denied*, 409 U.S. 889, 93 S.Ct. 154, 34 L.Ed.2d 146 (1972) (witnesses could be forced to travel to Guam).

A further consideration bolsters our conclusion. While it is the duty of a citizen to respond to the process of a court and give testimony even in the event of certain hardships [*Blackmer v. United States, supra; In re Grand Jury Proceedings*, 532 F.2d 404 (5th Cir. 1976), *cert. denied* 429 U.S. 940, 97

S.Ct. 354, 50 L.Ed.2d 309 (1976); *cf. United States v. Lansky*, 496 F.2d 1063 (5th Cir. 1974)], it is far different to require him to leave the protections of the laws of this country and subject himself to the laws of another foreign country. "It is the fundamental right of an American citizen to reside wherever he wishes, whether in the United States or abroad, and to engage in the consequent travel." *Acosta v. Gaffney*, 558 F.2d 1153, 1157 (3rd Cir. 1977).

Absent clear congressional authority, we decline to recognize such power.

It is apparent from the congressional hearings that Congress was aware of the limitation on the subpoena power. *See* Legislative History, *supra*. It is likewise clear that Congress intended the use of depositions to substitute for the attendance of witnesses in those noncapital cases where

the witness by reason of death, age, sickness, bodily infirmity, imprisonment, military necessity, *nonamenability to process*, or other reasonable cause, is unable or refuses to appear and testify in person at the place of trial or hearing.

Article 49(d)(2), UCMJ, 10 U.S.C. § 849(d)(2) (emphasis added). *See* Legislative History, *supra* at 1064–70. Decisions of this Court have limited the broad use of depositions envisioned by Congress. The Congress creates and establishes the jurisdiction of all inferior courts, [*Irvine v. Marshall*, 61 U.S. (20 How.) 558, 15 L.Ed. 994 (1858); *see also Chicot County Drainage Dist. v. Baxter State Bank*, 308 U.S. 371, 60 S.Ct. 317, 84 L.Ed. 329 (1940)] and this is particularly true as to this Court. It may well be that we should not have limited the power given to the military justice system so as to create the problem faced here. In view of the recent experience with the limitations created by this Court to the language of Article 2(a)(1), UCMJ, 10 U.S.C. § 802(a)(1), which were specifically repudiated by Congress [93 Stat. 810 (1979)], we would be ill-advised to propose corrective legislation in this area without attempting to use the authority already available to us.

---

10. *Cf. United States v. Polizzi*, 323 F.Supp. 222 (C.D.Cal.1971), *rev'd on other grounds*, 450 F.2d 880 (9th Cir. 1971), *citing United States v. Standard Oil Co.*, 316 F.2d 884 (7th Cir. 1963).

However, in sum, we hold that the witness Reddick was not subject to subpoena to testify before the court-martial convened in the Philippines, and we uphold the finding of the military judge in that regard. We also hold that the refusal to grant a change of venue was a proper exercise of the discretion of the military judge, particularly in view of the cumulative nature of the expected testimony of the witness. The decision of the United States Air Force Court of Military Review is affirmed.

Chief Judge EVERETT concurs.

FLETCHER, Judge (concurring in part):

Defense counsel on August 29, 1979, notified the convening authority that in case of referral of charges against appellant, he would request the presence at trial of Sergeant William Reddick. He averred that Sergeant Reddick "as ... the first law enforcement person to arrive" at the crime scene, would "testify as to his observations of the persons present."

Defense counsel also noted that Sergeant Reddick would be "separating from the Air Force on 6 September 1979," and might "return to the United States." Anticipating the very problems discussed in the majority opinion, he requested that Sergeant Reddick be deposed. No action was taken by the convening authority on this request.

On August 30, 1979, charges were preferred against appellant. On August 31, 1979, a pretrial investigating officer was designated by the convening authority. Sergeant William Reddick was called as a witness before an Article 32 investigation on September 4, 1979, and gave information concerning his knowledge of the incident. The investigating officer noted in his report

that "Sergeant Reddick has PCS'd to CONUS on 5 September 1979." The report of the Article 32 investigation was submitted to the convening authority on September 26, 1979.

I agree with the majority opinion that reasonable conduct by the convening authority might have avoided many of the problems raised on this appeal. See Article 6(b), Uniform Code of Military Justice, 10 U.S.C. § 806(b).

Additionally, on the question of reversal of this conviction as a result of the absence at trial of the defense-requested witness, I agree with the facts as assessed by the majority. Moreover, I agree that this matter may be resolved against appellant on the basis of the decisions of this Court in *United States v. Hampton*, 7 M.J. 284 (C.M.A.1979), and *United States v. Lucas*, 5 M.J. 167 (C.M.A.1978). Nevertheless, I refuse to give approval to any *dicta* in the majority opinion which attempts to return this Court to the confusing state of law prior to the above opinions. It is not necessary in the present case nor is such an exercise in semantics particularly helpful at this time.

Finally, as to the specified issue in this case, I am as impressed as my Brother Judges with the *amicus curiae* brief filed by the Appellant Government Division of the Army. Yet, this issue need not be decided in the present case as indicated above. Moreover, little notice is paid to the fact that Article 46, UCMJ, 10 U.S.C. § 846, is a two-edged sword and today's decision would equally restrict the government's prosecutorial powers. *Cf. United States v. Whiting*, 12 M.J. 253 (C.M.A.1982). For these reasons, I cannot join the majority's conclusion on this question at the present time.